FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

2013 MAY 13  P 3: 39

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |  |
|---|---|---|
| JACQUELINE D. MARSTELLER<br>44918 Shore Drive<br>Tall Timbers, Maryland 20690 | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 1:13cv593<br>JCC/JFA |
| ECS FEDERAL, INC.<br>f/k/a ELECTRONIC CONSULTING<br>SERVICES, INC.<br>2750 Prosperity Drive, Suite 600<br>Fairfax, Virginia 22031 | ) | |
| Serve: James V. Irving, Esq.<br>2300 Wilson Boulevard, 7th Floor<br>Arlington, Virginia 22201<br>Registered Agent | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW THE PLAINTIFF, JACQUELINE D. MARSTERLLER, by

counsel, and moves this Court for entry of judgment in her favor, and against the

Defendant, ECS FEDERAL, INC. (formerly, "Electronic Consulting Services, Inc."), and

in support of such complaint alleges and avers as follows:

## NATURE OF ACTION

1.      This action states federal claims of gender discrimination pursuant to Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

## THE PARTIES

2.      The Plaintiff, Jacqueline D. Marsteller ("Ms. Marsteller"), is a resident and citizen of St. Mary's County in the State of Maryland.  At all times relevant hereto, Ms. Marsteller was employed by the Defendant in Fairfax County in the Commonwealth of Virginia.

3.      ECS FEDERAL, INC. ("ECS") is a Florida corporation registered to do business and in good standing in the Commonwealth of Virginia, with its principle offices located in this judicial district, in Fairfax County in the Commonwealth of Virginia.  The name change from Electronic Consulting Services, Inc. to ECS Federal, Inc. became effective on January 11, 2013.

4.      ECS is engaged in government contracting services. ECS describes itself as "a leading mid-sized provider of technology services to the United States Federal Government."  It maintains that, "Every day, our 1100+ employees focus on providing their technical talent to support the Federal Agencies and Departments of the US Government to serve, protect and defend the American People."

5.      Ms. Marsteller was an "employee" of ECS within the meaning of 42 U.S.C. § 2000e(f).

6.      ECS is an "employer" within the meaning of 42 U.S.C. §2000e(b).

7.      ECS is engaged in an industry affecting commerce and has had more than 15 employees in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 42 U.S.C. § 2000e(b).

8.      Upon information and belief, ECS is engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of twenty

2

or more calendar weeks in the current or preceding year, within the meaning of 29 U.S.C. § 2611 (4) (A).

## JURISDICTION

9.      This Court has jurisdiction over Ms. Marsteller's claims pursuant to 28 U.S.C. §§ 1331 and 1343(4).

10.     The amount in controversy exceeds the jurisdictional minimum amount for this Court.

11.     ECS is present in and regularly conducts business in this judicial district, maintains a registered agent for the service of process in this judicial district, and has ECS has offices in the County of Fairfax, in the Commonwealth of Virginia, in this judicial district.

12.     ECS is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

## VENUE

13.     ECS is present in and regularly conducts affairs and business activities in this judicial district.

14.     The causes of action alleged in this action arose in this judicial district.

15.     The unlawful employment practices committed by ECS occurred in this judicial district, employment records relevant to such practices are maintained and administered in this judicial district, and Ms. Marsteller still be employed in this judicial district but for the unlawful practices of ECS.

16.     Venue over Ms. Marsteller claims is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

## PROCEDURAL STATUS

17.     Ms. Marsteller timely filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC") on February 3, 2012.

18.     Over 180 days has passed since Ms. Marsteller filed her Charge.

19.     Ms. Marsteller received a right-to-sue letter dated April 5, 2013.

## BACKGROUND

20.     Ms. Marsteller began her employment with ECS on November 30, 2006 as a Senior Vice President in the IT Services Group.  After a re-organization in July, 2011, Ms. Marsteller became a Senior Vice President and Account Executive working in the Corporate Development Department.

21.     Ms. Marsteller's immediate supervisor was the Chief Operations Officer ("COO") and Executive VP of ECS, Jeffrey Powell ("Mr. Powell"), until Mr. Wilson, the Chief Strategy Officer ("CSO"), took over Corporate Development at ECS.

22.     Throughout Ms. Marsteller's employment with ECS, Ms. Marsteller performed in an exemplary manner, as evidenced by annual awards of salary increases and/or bonuses.

23.     Ms. Marsteller has received excellent performance evaluations and bonuses relating to her performance and revenue brought into the Company.

24.     Over the course of Ms. Marsteller's employment at ECS, Ms. Marsteller has been the Officer in Charge of winning roughly $240,000,000 in projected revenue backlog (the contractually stated contract/task order value including base year(s) and options), with a recent (Spring 2011) $155,000,000 contract win that was a Full and Open Large Business Competition (not set aside for small business, which gets discounted

4

when companies are valued for sale). This was the only single award Full and Open win and the second largest single award contract at the time the company had ever received.

25.     Ms. Marsteller also participated in a bonus program which was based on a percentage of Ms. Marsteller's salary (ranging from 30% to 100%) dependent upon revenue, number of proposals, profit, and customer satisfaction goals, both at the corporate and division levels.

26.     Throughout Ms. Marsteller's employment, and at the time of her termination, Ms. Marsteller was the highest ranking female at ECS, and the only female executive (at the level of Vice President or above) at ECS.

27.     The average score on all contracts for Ms. Marsteller's customer satisfaction rankings over the years, as indicated by monthly project reviews, ranged from 9 to 10, on a ten point scale.

28.     Prior to Ms. Marsteller's employment with ECS, ECS heavily recruited Ms. Marsteller to join the organization.

29.     In October 2005, Ms. Marsteller contacted Mr. Kapani to explore expanding her own business, Marstar, through subcontracting opportunities with ECS.

30.     Instead, Roy Kapani, the Chief Executive Office ("CEO") Kapani and Anthony Schulien, the Chief Financial Officer ("CFO"), offered to pay Ms. Marsteller's salary at Marstar for a year if she brought in "five people or so in services." In other words, ECS would pay Ms. Marsteller to secure new Federal Government services contracting business that would generate revenue equal or greater than the fully burdened rate for five Full Time Equivalents.

31.     During the time period November 2005 – September 2006, Ms. Marsteller performed well and contributed to a number of contract wins involving the Department of Labor ("DOL") and the United States Department of Agriculture ("USDA") – both clients/customers Ms. Marsteller had been involved with at her previous place of employment.

32.     As a result, in October of 2006 Mr. Powell told Ms. Marsteller that he and Mr. Kapani believed she could "make things happen," and offered her a full time position with ECS.

33.     After she requested to have ownership in ECS in exchange for leaving her own business, Mr. Powell presented an enhanced offer, which included a robust bonus plan and "ownership" in the company equal to 3% of the value of the company if ECS was sold.

34.     When Ms. Marsteller asked if the ownership share could be increased to 5%, Mr. Powell said, "no," because it would be too close to what Mr. Powell and Mr. Schulien had. Mr. Powell also told Ms. Marsteller that besides him and Mr. Schulien, she was the only other person given ownership. Mr. Powell stated that Mr. Kapani had an "exit strategy," meaning he planned on selling rather than going public, and planned to do so within a timeframe that would guarantee all would benefit from the ownership.

35.     After numerous requests for Mr. Kapani to provide written verification of the ownership agreement, in August 2008, ECS provided the written Change of Control Agreement promising her 3% if ECS was sold.

36.     After Ms. Marsteller joined ECS, its business model changed. The model that emerged after Scott Weaver ("Mr. Weaver") was hired to run the Business

6

Development Department was that Mr. Weaver was responsible for all business development functions with limited support from executives in the Operations Department such as Richard August ("Dr. August") and Ms. Marsteller. Dr. August and Ms. Marsteller, as the Operations Division, were responsible for writing proposals.

37.     Mr. Kapani often visited Dr. August and Mr. Weaver, Ms. Marsteller's male counterparts, when Mr. Powell was out of the office on travel. He rarely did the same with Ms. Marsteller.

38.     In March of 2009, Ms. Marsteller spoke to Mr. Powell regarding Ms. Marsteller's concerns with the business pipeline, and the fact it did not have business that would support each of the business unit's revenue targets. Mr. Powell explained that he and Mr. Kapani thought it was the "best pipeline ever," and further stated that it was not Ms. Marsteller's job to worry about it.

39.     There were a number of times during the next couple of years that Mr. Kapani and/or Mr. Powell discussed ownership with Dr. August, Mr. Weaver and Ms. Marsteller. Mr. Powell and Mr. Kapani also made it known that Mr. Powell, Mr. Schulien, Mr. Weaver, Dr. August and Ms. Marsteller were the only executives at ECS "given an ownership position in the company by Mr. Kapani."

40.     In February 2010, Mr. Powell took the senior management team (Mr. Weaver, Dr. August, Randy Ball ("Mr. Ball") and Ms. Marsteller to lunch.

41.     During lunch, Ms. Marsteller explained that she was excited to have recently been more involved in capturing business, especially with agencies with which Ms. Marsteller was already familiar (e.g., Health and Human Services and the United States Postal Service). Mr. Powell became visibly angry, raised his voice, and said, "If

you are doing capture, then Scott [Weaver] is not doing his job. He must need more people. Your focus needs to be writing proposals." Mr. Weaver, Dr. August and Mr. Ball all jumped in and explained that the line between "capture management" and "pre-proposal preparation" was a grey area, and it really was just semantics.

42.     In the fall of 2010, Mr. Powell commented that an offer had been made to purchase ECS for $60 million. This was less than Mr. Kapani had expected, and the focus changed to increasing the value of the company, especially by winning full and open work. Ms. Marsteller had been focused on two full and open opportunities, doing "pre-proposal preparation" for a large United States Postal Service National Customer Support Center (USPS NCSC) opportunity, and a full and open Government Wide Acquisition contract (GWAC) with HHS, CIO-SP3. Historically, Mr. Kapani and ECS placed great value on GWAC vehicles, and this one is used more by DOD than any other agency.

43.     In December 2010, during bonus discussions, Mr. Kapani stated that he did not believe Ms. Marsteller should be compensated for revenues secured under previous contracts that Ms. Marsteller no longer managed due to the formation of a new business unit. Ms. Marsteller explained that this was not appropriate given the bonus program that had been offered to her, and which Ms. Marsteller accepted as part of her compensation. In addition, Ms. Marsteller remained the "Officer in Charge" responsible for winning this work.

44.     Mr. Kapani agreed to continue to include the United States Department of Agriculture (USDA) Farm Services Agency (FSA) contract in Ms. Marsteller's bonus program.

45.     During the bonus discussion, Mr. Powell relayed that Mr. Kapani authorized him to assure Ms. Marsteller that, if secured the USPS NCSC business, they would pay Ms. Marsteller for that win in one lump sum at one percent (1%) of the total value of the contract ($155M).  The USPS NCSC win would have been one of the largest contracts ECS had ever won, and, the commission from it would have compensated Ms. Marsteller for agreeing to forego her other commissions.   Mr. Powell explained that ECS had entered into a similar agreement for Stanley Goodwin when ECS won the Army PEO STRI work.

46.     In June 2011, Mr. Powell informed Ms. Marsteller and Dr. August of a new "capture management" role and explained that it would help ECS to achieve a new goal of $300 million in annual revenue in three years prior to selling the company.  Mr. Powell and Mr. Kapani stressed to Ms. Marsteller and Dr. August the vital importance of their new role to meet the $300 million goal prior to selling the company.

47.     Mr. Kapani also reassured Ms. Marsteller and Dr. August that the ownership percentage offered to Mr. Weaver and Mr. Wilson came out of his, Mr. Powell's and Mr. Schulien's percent ownership, not Ms. Marsteller's and Dr. August's ownership percent.  Mr. Kapani also said that as owners, they would all benefit from the resulting increased value and sales price of the company.

48.     Both Dr. August and Ms. Marsteller objected to the Capture Manager classification, which appeared to be a demotion (a junior business developer was the only other individual to hold this classification), but Mr. Kapani reassured them about their leadership and ownership roles in the company.

49.     Mr. Powell further stated that Dr. August and Ms. Marsteller were the only ones he could trust to fill the Capture roles. He told them that, "as owners of the Company," they should support the change.

50.     During this same discussion, Mr. Powell informed Ms. Marsteller and Dr. August that the bonus plan would change as part of the reorganization.

51.     On October 21, 2011, Ms. Marsteller met with Mr. Wilson after a Friday morning meeting. During the meeting Ms. Marsteller had asked whether all Account Executives should be reporting on all opportunities in pipeline. When Ms. Marsteller asked what she should be doing differently, Mr. Wilson told Ms. Marsteller she was doing everything right, and told her to just keep doing what she was doing, or words to that effect.

52.     By October 26, 2011, Ms. Marsteller was making progress on opportunities in her pipeline, establishing contacts, and moving forward.

53.     On October 28, 2011, Ms. Marsteller submitted documentation to Mr. Wilson on three opportunities that she was postured to bring as business to ECS. Mr. Wilson concurred with Ms. Marsteller's efforts.

54.     On November 3, 2011, Ms. Marsteller attended a "review" meeting conducted by Mr. Wilson.

55.     At that time, Mr. Wilson told Ms. Marsteller, "We don't see this working out with you," and stated that Ms. Marsteller was not "senior enough" to be a Senior VP in the Account Exec role.

56.     Mr. Wilson also said Ms. Marsteller was not skilled in accounts or other areas the company was moving into, such as DOD agencies. He referred to Ms.

Marsteller's expertise and business area focus as "low level, help desk, up for grabs every five years." He said the company wanted more Systems Engineering and Technical Assistance (SETA) work. In fact, Ms. Marsteller had been responsible for one of the largest contracts that ECS had at the time.

57. Mr. Wilson told Ms. Marsteller that she would be "out" by the end of the year, but that Ms. Marsteller could announce her departure has having been her decision so that it would appear voluntary.

58. Ms. Marsteller was in shock and disbelief, and concerned about her role as a 3% owner/stakeholder, which had been confirmed by Mr. Kapani as recently as July 2011.

59. Ms. Marsteller was the only female Account Executive at ECS and the only female member of the Leadership Team (defined as having ownership and at a level VP or above).

60. Mr. Wilson also told Ms. Marsteller that she was "not a senior enough Senior Vice President." This statement evidenced Mr. Wilson's perception that Ms. Marsteller, as the only female member of the Senior Executive Team, was not as "senior" as her male colleagues.

61. Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to woman owned and small businesses.

62. In fact, Ms. Marsteller had not been focusing on 8(a) business. Of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business.

63.     Ms. Marsteller's (male) Account Executive colleagues and Business Development peers (Scott Weaver) handled much more 8(a) business (including recent wins at EPA). They remained employed at ECS at the time of Ms. Marsteller's termination.

64.     Ms. Marsteller's male colleagues, who brought in less revenue, and all of whom had a less robust and qualified pipeline, were not terminated.

65.     Meanwhile, ECS continued to pursue business in Ms. Marsteller's pipeline, in sharp contract to the stated (false) reason for her termination.

66.     Ms. Marsteller had much more experience than her male counterparts in the area of account management and business development, made significant contributions in 2011, and exceeded Division objectives. Yet, she was terminated and her male colleagues were not.

67.     At the time of her termination, Ms. Marsteller was the only Account Executive or Business Development person who had meet their Annual Goals and Objectives.

### COUNT ONE –
### GENDER DISCRIMINATION IN VIOLATION OF TITLE VII
### (against Electronic Consulting Services, Inc.)

68.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

69.     ECS discriminated against Ms. Marsteller on the basis of her gender, female.

70. Ms. Marsteller was the highest ranking female at ECS, and the only female executive (VP or above) at ECS, throughout her employment and at the time of her termination.

71. Ms. Marsteller was treated differently based on her gender. This disparate treatment included, but was not limited to, ECS' President and CEO, Mr. Kapani, visiting Ms. Marsteller's male counterparts, Dr. August and Mr. Weaver but not Ms. Marsteller, transferring Ms. Marsteller to an Account Executive roles over their objections, and then firing Ms. Marsteller because the role was "not working out."

72. At that time of her termination, Ms. Marsteller was told she was not a "senior enough" Senior VP. Ms. Marsteller was the only female member of the Senior Executive Team, the only female Account Executive at ECS, and the only female member of the Leadership Team (defined as having ownership and being a Vice President or above).

73. During Ms. Marsteller's termination meeting, Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to minority (including women owned) and small businesses.

74. Ms. Marsteller had not been focusing on 8(a) business. Of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business. Ms. Marsteller's Account Executive (male) colleagues had much more involvement in 8(a) business. The other (male) Account Executives with more 8(a) business than Ms. Marsteller remained employed with ECS after Ms. Marsteller's departure.

13

75.     Other Account Execs, who are not female, and who did not bring in as much revenue as Ms. Marsteller did, and all of whom had a less robust and qualified pipeline, were not terminated.

76.     At the time of Ms. Marsteller's termination, ECS denied Ms. Marsteller her earned commission based on division revenue for 2011, and terminated Ms. Marsteller for a discriminatory reason.

77.     Meanwhile, ECS is continuing to pursue business in Ms. Marsteller's pipeline, in sharp contract to the stated (false) reason for her termination.

78.     ECS's discriminatory treatment of Ms. Marsteller violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

79.     In discriminating against Ms. Marsteller in violation of federal law, ECS evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Marsteller.

80.     As a direct and proximate result of ECS's actions, Ms. Marsteller has suffered and continues to suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, stomach pains, weight loss, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

81.     Due to the conscious disregard for Ms. Marsteller's federally protected rights, and the severity of ECS' conduct, Ms. Marsteller is also entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JACQUELINE D. MARSTELLER requests that this

Court enter judgment in her favor and against Defendants ELECTRONIC

CONSULTING SERVICES, INC. on the above count, and further:

(a)    Award Ms. Marsteller compensatory damages to be determined by a jury,

plus demonstrated past and future pecuniary damages on each of the above-stated Count;

and in addition

(b)    Award Ms. Marsteller punitive and exemplary damages, to be determined

by a jury, on Count One; and in addition

(c)    Award Ms. Marsteller appropriate front pay and back pay, including all

lost income and benefits of employment both past and future; and in addition

(d)    Award Ms. Marsteller attorneys' fees and the costs of this action; and in

addition

(e)    Award injunctive relief consisting of an order prohibiting Defendant ECS

from engaging in further employment practices that create or tolerate a hostile or

discriminatory work environment based on gender; and in addition

(f)    Award Ms. Marsteller such other and further relief as may be appropriate

under the circumstances.

## JURY DEMAND

**PLAINTIFF JACQUELINE D. MARSTELLER DEMANDS A TRIAL BY**

**JURY.**

May 13, 2013                              Respectfully submitted,

Carla D. Brown
Virginia Bar No. 44803
CHARLSON BREDEHOFT COHEN
  BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile

*Counsel for Plaintiff,*
  *Jacqueline D. Marsteller*

16