**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| JACQUELINE D. MARSTELLER ) | |
| 44918 Shore Drive ) | |
| Tall Timbers, Maryland  20690 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ECS FEDERAL, INC. ) | C.A. No. 1:13cv593 |
| f/k/a ELECTRONIC CONSULTING ) | (JCC/JFA) |
| SERVICES, INC. ) | |
| 2750 Prosperity Drive, Suite 600 ) | |
| Fairfax, Virginia  22031 ) | |
| ) | |
| Serve:  James V. Irving, Esq. ) | |
| 2300 Wilson Boulevard, 7th Floor ) | |
| Arlington, Virginia 22201 ) | |
| Registered Agent ) | |
| ) | |
| and ) | |
| ) | |
| S. ROY KAPANI ) | |
| 7305 Peter Place ) | |
| McLean, Virginia 22102 ) | |
| ) | |
| and ) | |
| ) | |
| GEORGE WILSON ) | |
| 2750 Prosperity Drive, Suite 600 ) | |
| Fairfax, Virginia  22031 ) | |
| ) | |
| Defendants. ) | |

<u>**AMENDED COMPLAINT**</u>

COMES NOW THE PLAINTIFF, JACQUELINE D. MARSTERLLER, by

counsel, and moves this Court for entry of judgment in her favor, and against the

Defendant, ECS FEDERAL, INC. (formerly, "Electronic Consulting Services, Inc."), S.

ROY KAPANI and GEORGE WILSON, jointly and severally, and in support of such complaint alleges and avers as follows:

## NATURE OF ACTION

1.     This action states federal claims of gender discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

2.     This action also states common law claims alleging breach of contract and unjust enrichment against ECS Federal, Inc., tortious interference with business expectancies against the individual defendants, fraud and constructive fraud against Defendants ECF Federal, Inc. and S. Roy Kapani, and civil conspiracy against all defendants.

3.     This action also states a claim for wrongful termination in violation of Va. Code § 40.1-29, in order to avoid paying Ms. Marsteller promised, but unpaid, compensation which was owed to her.

## THE PARTIES

4.     The Plaintiff, Jacqueline D. Marsteller ("Ms. Marsteller"), is a resident and citizen of St. Mary's County in the State of Maryland.  At all times relevant hereto, Ms. Marsteller was employed by the Defendant in this judicial district, in Fairfax County in the Commonwealth of Virginia.

5.     Defendant ECS Federal, Inc. ("ECS") is a Florida corporation registered to do business and in good standing in the Commonwealth of Virginia, with its principle offices located in this judicial district, in Fairfax County in the Commonwealth of Virginia.  The name change from Electronic Consulting Services, Inc. to ECS Federal, Inc. became effective on January 11, 2013.

6.      ECS is engaged in government contracting services. ECS describes itself as "a leading mid-sized provider of technology services to the United States Federal Government."  It maintains that, "Every day, our 1100+ employees focus on providing their technical talent to support the Federal Agencies and Departments of the US Government to serve, protect and defend the American People."

7.      Ms. Marsteller was an "employee" of ECS within the meaning of 42 U.S.C. § 2000e(f).

8.      ECS is an "employer" within the meaning of 42 U.S.C. §2000e(b).

9.      ECS is engaged in an industry affecting commerce and has had more than 15 employees in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 42 U.S.C. § 2000e(b).

10.     Upon information and belief, ECS is engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 29 U.S.C. § 2611 (4) (A).

11.     S. Roy Kapani ("Mr. Kapani") is a resident and citizen of Fairfax County in the Commonwealth of Virginia, and employed by ECS in this judicial district.

12.     At all times relevant hereto, Mr. Kapani was (and is) the President and Chief Executive Officer of ECS, with supervisory authority over Ms. Marsteller.

13.     At all times relevant hereto, Mr. Wilson was (and is) employed by ECS in this judicial district.  During Ms. Marsteller's employment, Mr. Wilson was the Chief Strategy Officer of ECS, and Ms. Marsteller's direct supervisor.   Mr. Wilson became the President and COO of ECS in January 2012.

## JURISDICTION

14.     This Court has jurisdiction over Ms. Marsteller's claims pursuant to 28 U.S.C. §§ 1331 and 1343(4).

15.     This Court has jurisdiction over Ms. Marsteller's claims under the common laws of Virginia.

16.     The amount in controversy exceeds the jurisdictional minimum amount for this Court.

17.     ECS is present in and regularly conducts business in this judicial district, maintains a registered agent for the service of process in this judicial district, and ECS has offices in the County of Fairfax, in the Commonwealth of Virginia, in this judicial district.

18.     Mr. Kapani is a resident and citizen of Fairfax County in the Commonwealth of Virginia, and President and CEO of ECS in Fairfax County, in this judicial district.

19.     Mr. Wilson was the CSO of ECS in Fairfax County in the Commonwealth of Virginia, and in January 2012, Mr. Wilson became the President and COO of ECS, in this judicial district.

20.     ECS, Mr. Kapani and Mr. Wilson are subject to personal jurisdiction of this Court.

## VENUE

21.     ECS is present in and regularly conducts affairs and business activities in this judicial district.

4

22.     The causes of action alleged in this action arose in this judicial district.

23.     The unlawful employment practices committed by ECS occurred in this judicial district, employment records relevant to such practices are maintained and administered in this judicial district, and Ms. Marsteller still be employed in this judicial district but for the unlawful practices of ECS.

24.     Venue over Ms. Marsteller's claims is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

25.     Mr. Kapani is the President and CEO of ECS in Fairfax County in this judicial district.

26.     At all times relevant hereto, Mr. Wilson was the Chief Strategy Officer of ECS in Fairfax County, in this judicial district.  Mr. Wilson became the President and COO of ECS in January 2012.

27.     The tortious acts and causes of action alleged to have been engaged in were committed in this judicial district, in Fairfax County in the Commonwealth of Virginia.

28.     Injury to Ms. Marsteller, as well as the breaches of contract, occurred in this judicial district, in Fairfax County in the Commonwealth of Virginia.

29.     Venue over Ms. Marsteller's common law claims is proper under Va. Code 8.01-262(1), (2), (3) and (4).

## **PROCEDURAL STATUS**

30.     Ms. Marsteller timely filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC") on February 3, 2012.

31.    Over 180 days has passed since Ms. Marsteller filed her Charge.

32.    Ms. Marsteller received a right-to-sue letter dated April 5, 2013.

**BACKGROUND**

33.    Ms. Marsteller began her employment with ECS on November 30, 2006 as a Senior Vice President in the IT Services Group.  After a re-organization in July, 2011, Ms. Marsteller became a Senior Vice President and Account Executive working in the Corporate Development Department.

34.    Ms. Marsteller's immediate supervisor was the Chief Operations Officer ("COO") and Executive Vice President of ECS, Jeffrey Powell ("Mr. Powell"), until George Wilson ("Mr. Wilson"), the Chief Strategy Officer ("CSO"), took over Corporate Development at ECS.

35.    Throughout Ms. Marsteller's employment with ECS, Ms. Marsteller performed in an exemplary manner, as evidenced by annual awards of salary increases and/or bonuses.

36.    Ms. Marsteller has received excellent performance evaluations and bonuses for her performance and revenue brought into the Company.

37.    Over the course of Ms. Marsteller's employment at ECS, Ms. Marsteller has been the Officer in Charge of winning roughly $240,000,000 in projected revenue and backlog (the contractually stated contract/task order value including base year(s) and options), with a recent (Spring 2011) $155,000,000 USPS contract win that was a Full and Open Large Business Competition (not set aside for small business, which gets discounted when companies are valued for lines of credit and for sale), and a coveted Full and Open Government Wide Acquisition Contract (GWAC) award made after her termination, CIOSP3, that is managed by National Institute of Health (NIH), but most

6

widely used by the Department of Defense (DOD).  CIOSP3 was the first Full and Open GWAC award, and USPS was the only single award Full and Open win and the second largest single award contract that ECS had ever received.

38.     Ms. Marsteller also participated in an annual bonus program which was based on a percentage of Ms. Marsteller's salary (ranging from 30% to 100%) dependent upon revenue, number of proposals her group submitted, profit, and customer satisfaction goals (both at the corporate and division levels).

39.     Throughout Ms. Marsteller's employment, and at the time of her termination, Ms. Marsteller was the highest ranking female at ECS, and the only female executive (at the level of Vice President or above) at ECS.

40.     The average score on all contracts for Ms. Marsteller's customer satisfaction rankings over the years, as indicated by quarterly project reviews, ranged from nine to ten, on a ten point scale.

41.     Prior to Ms. Marsteller's employment with ECS, ECS heavily recruited Ms. Marsteller to join the organization.

42.     In October 2005, Ms. Marsteller contacted Mr. Kapani to explore expanding her own business, Marstar, through subcontracting opportunities with ECS.

43.     Instead, Roy Kapani, the Chief Executive Office ("CEO") Kapani and Anthony Schulien, the Chief Financial Officer ("CFO"), offered to pay Ms. Marsteller's salary at Marstar for a year if she brought in "five people or so in services."  In other words, ECS would pay Ms. Marsteller to secure new Federal Government services contracting business that would generate revenue equal or greater than the fully burdened rate for five Full Time Equivalents.

7

44.     During the time period November 2005 – September 2006, Ms. Marsteller performed well and contributed to a number of contract wins involving the Department of Labor ("DOL") and the United States Department of Agriculture ("USDA") – both clients/customers Ms. Marsteller had been involved with at her previous place of employment.

45.     As a result, in October of 2006 Mr. Powell told Ms. Marsteller that he and Mr. Kapani believed she could "make things happen," and offered her a full time position with ECS.

46.     After Ms. Marsteller requested to have ownership in ECS in exchange for leaving her own business, Mr. Powell presented an enhanced offer, which included a robust bonus plan and "ownership" in the company equal to 3% of the value of the company if ECS was sold.

47.     When Ms. Marsteller asked if the ownership share could be increased to 5%, Mr. Powell said, "no," because it would be too close to what Mr. Powell and Mr. Schulien had.  Mr. Powell also told Ms. Marsteller that besides him and Mr. Schulien, she was the only other person given ownership.  Mr. Powell stated that Mr. Kapani had an "exit strategy," meaning he planned on selling rather than going public, and planned to do so within a timeframe that would guarantee all would benefit from the ownership.

48.     After numerous requests for Mr. Kapani to provide written verification of the ownership agreement, in August 2008, ECS provided the written Change of Control Agreement promising Ms. Marsteller 3% if ECS was sold.

49.     After Ms. Marsteller joined ECS, its business model changed.  The model that emerged after Scott Weaver ("Mr. Weaver") was hired to run the Business

Development Department was that Mr. Weaver was responsible for all business development functions with limited support from executives in the Operations Departments such as Richard August ("Dr. August") and Ms. Marsteller. Dr. August and Ms. Marsteller, as the two most experienced Operations executives, were responsible for writing proposals.

50.     Mr. Kapani often visited Dr. August and Mr. Weaver, Ms. Marsteller's male counterparts, when Mr. Powell was out of the office on travel. He rarely did the same with Ms. Marsteller.

51.     In March of 2009, Ms. Marsteller spoke to Mr. Powell regarding her concerns with the business pipeline, and the fact it did not have business that would support each of the business unit's revenue targets. Mr. Powell explained that he and Mr. Kapani thought it was the "best pipeline ever," and further stated that it was not Ms. Marsteller's job to worry about it.

52.     There were a number of times during the next couple of years that Mr. Kapani and/or Mr. Powell discussed ownership with Dr. August, Mr. Weaver and Ms. Marsteller. Mr. Powell and Mr. Kapani also made it known that Mr. Powell, Mr. Schulien, Mr. Weaver, Dr. August and Ms. Marsteller were the only executives at ECS "given an ownership position in the company by Mr. Kapani."

53.     In February 2010, Mr. Powell took the senior management team (Mr. Weaver, Dr. August, Randy Ball ("Mr. Ball") and Ms. Marsteller) to lunch.

54.     During lunch, Ms. Marsteller explained that she was excited to have recently been more involved in capturing business, especially with agencies with which Ms. Marsteller was already familiar (e.g., Health and Human Services and the United

9

States Postal Service).  Mr. Powell became visibly angry, raised his voice, and said, "If you are doing capture, then Scott [Weaver] is not doing his job.  He must need more people.  Your focus needs to be writing proposals."  Mr. Weaver, Dr. August and Mr. Ball all jumped in and explained that the line between "capture management" and "pre-proposal preparation" was a grey area, and it really was just semantics.

55.     In the fall of 2010, Mr. Powell commented that an offer had been made to purchase ECS.  The amount was less than Mr. Kapani had expected, and the focus changed to increasing the value of the company, especially by winning "full and open" work.  Ms. Marsteller had been focused on two full and open opportunities, doing "pre-proposal preparation" for a large United States Postal Service National Customer Support Center (USPS NCSC) opportunity, and a full and open Government Wide Acquisition contract (GWAC) with HHS, CIO-SP3.  Historically, Mr. Kapani and ECS placed great value on GWAC vehicles, and this one is used more by DOD than any other agency.

56.     In December 2010, during bonus discussions, Mr. Kapani stated that he did not believe Ms. Marsteller should be compensated for revenues secured under existing ECS contracts that she had been responsible for winning, but which she no longer managed due to the formation of a new business unit.  Ms. Marsteller took exception to this, explaining that this was not appropriate given the bonus program that had been offered to her, and which Ms. Marsteller accepted as part of her compensation.  In addition, Ms. Marsteller remained the "Officer in Charge" responsible for winning this work and had been the primary person responsible for writing these proposals.

57.     Mr. Kapani agreed to continue to include the United States Department of Agriculture (USDA) Farm Services Agency (FSA) contract task orders in Ms.

10

Marsteller's bonus program for 2010, but Ms. Marsteller was forced to forego the bonuses associated with the GNMA contract.  Although Ms. Marsteller had worked over Christmas holiday on the proposal to ensure a contract was in place to cover staff, Mr. Kapani took the position that he was the one responsible for the initial contract win years before, so therefore he refused to count it, unilaterally changing the terms of this portion of Ms. Marsteller's compensation.

58.     During the bonus discussion, Ms. Marsteller asked Mr. Powell how she should feel about the potential award of the USPS contact; the fact that he and Mr. Kapani could reorganize at any time; and, the fact that Mr. Kapani did not feel the need to reward Officers in Charge/Division Leads for work they were responsible for winning if they no longer managed the work.  Mr. Powell relayed that Mr. Kapani authorized him to assure Ms. Marsteller that if she secured the USPS NCSC business, ECS would pay Ms. Marsteller for the win in one lump sum at one percent (1%) of the total value of the contract ($155M).  Mr. Powell later referred to the promised bonus as the "one percent lump sum."

59.     The USPS NCSC win would have been one of the largest contracts ECS had ever won, and, the commission from it would have compensated Ms. Marsteller for "agreeing" to forego her other commissions.  Mr. Powell explained that ECS had entered into a similar agreement for Stanley Goodwin when ECS won the Army PEO STRI work.

60.     In June 2011, Mr. Powell informed Ms. Marsteller and Dr. August of a new "capture management" role and explained that it would help ECS to achieve a new goal of for annual revenue in three years prior to selling the company.  Mr. Powell and

Mr. Kapani stressed to Ms. Marsteller and Dr. August the vital importance of their new role to meet the new goal prior to selling the company.

61.     Mr. Kapani also reassured Ms. Marsteller and Dr. August that the ownership percentage offered to Mr. Weaver and Mr. Wilson came out of his, Mr. Powell's and Mr. Schulien's percent ownership, not Ms. Marsteller's and Dr. August's ownership percent.  Mr. Kapani also said that as owners, they would all benefit from the resulting increased value and sales price of the company.

62.     Both Dr. August and Ms. Marsteller objected to the Capture Manager classification, which appeared to be a demotion (a junior business developer was the only other individual to hold this classification), but Mr. Kapani reassured them about their leadership and ownership roles in the company.

63.     Mr. Powell further stated that Dr. August and Ms. Marsteller were the only ones he could trust to fill the Capture roles.  He told them that, "as owners of the Company," they should support the change.

64.     During this same discussion, Mr. Powell informed Ms. Marsteller and Dr. August that the bonus plan would change as part of the reorganization.

65.     On or around April 4, 2011, while Ms. Marsteller was still employed at ECS, ECS announced the successful capture of the USPS NCSC business, a contract valued at $155M.  Ms. Marsteller was credited with the win based on her significant efforts resulting in the capture.

66.     Based on Mr. Kapani's representations that Ms. Marsteller would be awarded 1% of the USPS NCSC contract award, Ms. Marsteller was entitled to a bonus in the amount of $1.55M.

67.     Bonuses were traditionally paid in late December (Christmas week) at ECS.  Ms. Marsteller had no reason to believe she would not receive her bonus of $1.55M for the USPS NCSC contract in December 2011.

68.     On October 21, 2011, Ms. Marsteller met with Mr. Wilson after a Friday morning meeting. During the meeting Ms. Marsteller had asked whether all Account Executives should be reporting on all opportunities in pipeline.  When Ms. Marsteller asked what she should be doing differently, Mr. Wilson told Ms. Marsteller she was doing everything right, and told her to just keep doing what she was doing, or words to that effect.

69.     By October 26, 2011, Ms. Marsteller was making progress on opportunities in her pipeline, establishing contacts, and moving forward.

70.     On October 28, 2011, Ms. Marsteller submitted documentation to Mr. Wilson on three opportunities that she was postured to bring as business to ECS.  Mr. Wilson concurred with Ms. Marsteller's efforts.

71.     During that same time, Ms. Marsteller received a letter from Mr. Kapani informing her that she had received a 1% salary increase.

72.     On November 3, 2011, Ms. Marsteller attended a meeting conducted by Mr. Wilson.

73.     At that time, Mr. Wilson told Ms. Marsteller, "We don't see this working out with you," and stated that Ms. Marsteller was not "senior enough" to be a Senior VP in the Account Exec role.

74.     Mr. Wilson also said Ms. Marsteller was not skilled in accounts or other areas the company was moving into, such as DOD agencies.  He referred to Ms.

13

Marsteller's expertise and business area focus as "low level, help desk, up for grabs every five years."  He said the company wanted more Systems Engineering and Technical Assistance (SETA) work.   In fact, Ms. Marsteller had been responsible for one of the largest contracts that ECS had at the time.

75.    Mr. Wilson told Ms. Marsteller that she would be "out" by the end of the year, but that Ms. Marsteller could announce her departure has having been her decision so that it would appear voluntary.

76.    Mr. Wilson claimed ECS "wanted this to be seen as a win/win" and was interested in hiring Ms. Marsteller as a consultant to ECS after her termination, effective Dec. 31, 2011.

77.    When Ms. Marsteller asked about her expected and earned bonus, Mr. Wilson told Ms. Marsteller that bonuses would be "much less than expected" since "this year we are not making our numbers."  Ms. Marsteller questioned the truth of Mr. Wilson's statement, especially given the huge USPS win.

78.    Ms. Marsteller was the only female Account Executive at ECS and the only female member of the Leadership Team (defined as having ownership and at a level VP or above).

79.    Mr. Wilson also told Ms. Marsteller that she was "not a senior enough Senior Vice President."  This statement evidenced Mr. Wilson's perception that Ms. Marsteller, as the only female member of the Senior Executive Team, was not as "senior" as her male colleagues.

80.     Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to women owned and small businesses.

81.     In fact, Ms. Marsteller had not been focusing on 8(a) business.  Of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business.

82.     Ms. Marsteller's (male) Account Executive colleagues and Business Development peers (Scott Weaver) handled much more 8(a) business (including recent wins at EPA).  They remained employed at ECS at the time of Ms. Marsteller's termination.

83.     Ms. Marsteller's male colleagues, who brought in less revenue, and all of whom had a less robust and qualified pipeline, were not terminated.

84.     Meanwhile, ECS continued to pursue business in Ms. Marsteller's pipeline and other areas of expertise.  In fact, in sharp contract to the stated (false) reason for her termination, ECS's website lists Ms. Marsteller's areas of practice as its top Service area under Solutions, IT Infrastructure Support, and Federal Civilian is still listed as one of ECS's three markets.

85.     Ms. Marsteller had much more experience than her male counterparts in the area of account management and business development, made significant contributions in 2011, and exceeded Division objectives.  Yet, she was terminated and her male colleagues were not.

86.     At the time of her termination, Ms. Marsteller was the only Account Executive or Business Development person who had meet their Annual Goals and Objectives.

87.     At the time of her termination (and as of today), ECS had not paid Ms. Marsteller her bonus on the amount of 1% of the value of the USPS NCSC contract, or $1.55M.

## COUNT ONE –
## <u>GENDER DISCRIMINATION IN VIOLATION OF TITLE VII</u>
### (against ECS Federal, Inc.)

88.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

89.     ECS discriminated against Ms. Marsteller on the basis of her gender, female.

90.     Ms. Marsteller was the highest ranking female at ECS, and the only female executive (VP or above) at ECS, throughout her employment and at the time of her termination.

91.     Ms. Marsteller was treated differently based on her gender.  This disparate treatment included, but was not limited to, ECS' President and CEO, Mr. Kapani, visiting Ms. Marsteller's male counterparts, Dr. August and Mr. Weaver but not Ms. Marsteller, transferring Ms. Marsteller to an Account Executive role over her objections, and then firing Ms. Marsteller because the role was allegedly "not working out."

92.     At that time of her termination, Ms. Marsteller was told she was not a "senior enough" Senior VP.  Ms. Marsteller was the only female member of the Senior Executive Team, the only female Account Executive at ECS, and the only female

16

member of the Leadership Team (defined as having ownership and being a Vice President or above).

93.     During Ms. Marsteller's termination meeting, Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to minority (including women owned) and small businesses.

94.     Ms. Marsteller had not been focusing on 8(a) business.  Of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business.  Ms. Marsteller's Account Executive (male) colleagues had much more involvement in 8(a) business.  The other (male) Account Executives with more 8(a) business than Ms. Marsteller remained employed with ECS after Ms. Marsteller's departure.

95.     Other Account Execs, who are not female, and who did not bring in as much revenue as Ms. Marsteller did, and all of whom had a less robust and qualified pipeline, were not terminated.

96.     At the time of Ms. Marsteller's termination, ECS denied Ms. Marsteller her earned commission based on division revenue for 2011, and terminated Ms. Marsteller for a discriminatory reason.

97.     Meanwhile, ECS is continuing to pursue business in Ms. Marsteller's pipeline, in sharp contract to the stated (false) reason for her termination.

98.     ECS's discriminatory treatment of Ms. Marsteller  violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

99.     In discriminating against Ms. Marsteller in violation of federal law, ECS evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Marsteller.

100.    As a direct and proximate result of ECS's actions, Ms. Marsteller has suffered and continues to suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, stomach pains, weight loss, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

101.    Due to the conscious disregard for Ms. Marsteller's federally protected rights, and the severity of ECS' conduct, Ms. Marsteller is also entitled to punitive damages.

## COUNT TWO – BREACH OF CONTRACT
### (against ECS Federal, Inc.)

102.    After ECS, through Mr. Kapani, received an offer to purchase the company in the fall of 2010 for an amount substantially below what was expected, the focus turned to increasing the value of the company.  At that time, Ms. Marsteller had leads on two very lucrative contracts, one of which was the USPS NCSC business, worth $155M.  Mr. Powell relayed that Mr. Kapani authorized him to assure Ms. Marsteller that, if she secured the USPS NCSC business, ECS would pay Ms. Marsteller for that win in one lump sum, in an amount equal to one percent (1%) of the total value of the contract ($155M), or $1.55M.

103.     The USPS NCSC contract win was announced on or around April 3, 2011 and was ECS' largest contract award as of that time.

104.     Mr. Kapani was aware that by representing to Ms. Marsteller that she would be compensated at 1% of the value of the USPS NCSC contract if she secured the business, that Ms. Marsteller was relying on his representation in that the 1% of the USPS NCSC business would compensate Ms. Marsteller for agreeing to forego her other commissions (30-100% of salary as annual bonus that would have been due late December 2011).

105.     Based on Mr. Kapani's representations made on behalf of ECS that Ms. Marsteller would be awarded 1% of the USPS NCSC contract award, Ms. Marsteller was entitled to a bonus in the amount of $1.55M.

106.     To date, ECS has failed to pay Ms. Marsteller her earned bonus, which should have been paid to her on or about December 24, 2011.

107.     At the time of her termination, ECS indicated its intent not to pay Ms. Marsteller her earned bonus.

108.     Ms. Marsteller substantially performed all duties required of her to earn the bonus amount of 1% of the USPS NCSC contract.

109.     ECS breached its obligation to Ms. Marsteller by refusing to pay Ms. Marsteller her bonus, which was a component of her compensation.

110.     Instead, ECS determined that it was not obligated to pay Ms. Marsteller her bonus.

111.    As a direct and proximate result of the breach by ECS, Ms. Marsteller has suffered and continues to suffer damages including loss of past and future of income, loss of use of income, opportunities, benefits, and other past pecuniary losses and future pecuniary losses.

### COUNT THREE – UNJUST ENRICHMENT
### (ALTERNATIVE PLEADING TO BREACH OF CONTRACT)
### (against ECS Federal)

112.    The foregoing allegations are incorporated as if realleged herein.

113.    Mr. Kapani, on behalf of ECS,  represented to Ms. Marsteller that if she secured the USPS NCSC business, ECS would pay Ms. Marsteller for that win in one lump sum, in an amount equal to one percent (1%) of the total value of the contract ($155M), or $1.55 M.

114.    The USPS NCSC contract win was announced on or around April 3, 2011.

115.    Ms. Marsteller substantially performed all duties required of her to be eligible for her earned bonus.

116.    ECS asked for, received and accepted the benefits that Ms. Marsteller conferred, but then refused to pay Ms. Marsteller the amounts owed to her, which was the value of 1% of the USPS NCSC contract, or a $1.55M.

117.    ECS terminated Ms. Marsteller for a false and sham reason, continued to work and earn substantial revenue from the USPS NCSC contract she brought in, and then refused to pay Ms. Marsteller her earned bonus on the contract.

118.    Based on ECS' conduct, deceit and dishonesty, it would be inequitable to allow ECS to retain the benefit of Ms. Marsteller's continued performance for the benefit

of ECS, without paying Ms. Marsteller the amount promised to her in exchange for her

performance which resulted in substantial revenue to her division and to ECS.

119.    ECS is unjustly enriched in the amount of the value of Ms. Marsteller's

earned bonus of 1% of the total value of the UPSP NCSC contract, or $1.55M, and

should pay to Ms. Marsteller the full value of her earned bonus, including interest, to

which Ms. Marsteller is entitled.

### COUNT FOUR –
### WRONGFUL TERMINATION IN VIOLATION OF VA. CODE § 40.1-29
### (against ECS Federal, Inc., S. Roy Kapani and George Wilson)

120.    After ECS, through Mr. Kapani, received an offer to purchase the

company in the fall of 2010 for an amount substantially below what was expected, the

focus turned to increasing the value of the company.  At that time, Ms. Marsteller had

leads on two very lucrative contracts, one of which was the USPS NCSC business, worth

$155M.  Mr. Powell relayed that Mr. Kapani authorized him to assure Ms. Marsteller

that, if she secured the USPS NCSC business, ECS would pay Ms. Marsteller for that win

in one lump sum, in an amount equal to one percent (1%) of the total value of the

contract ($155M), or $1.55M.

121.    The USPS NCSC contract win was announced on or around April 3, 2011

and was ECS' largest contract award as of that time.

122.    Based on Mr. Kapani's representations made on behalf of ECS that Ms.

Marsteller would be awarded 1% of the USPS NCSC contract award, Ms. Marsteller was

entitled to a bonus in the amount of $1.55M.

123.    On November 3, 2011, Ms. Marsteller attended a "review" meeting

conducted by Mr. Wilson.  During that meeting, Mr. Wilson told Ms. Marsteller, "We

don't see this working out with you" and terminated Ms. Marsteller's employment,

stating that Ms. Marsteller was not "senior enough" to be a Senior VP in the Account Exec role, that she was not skilled in accounts or other areas the company was moving into, such as DOD agencies, and referred to her expertise and business area focus as "low level, help desk, up for grabs every five years."

124.   At the time Mr. Wilson terminated Ms. Marsteller's employment for these demonstrably false and unjustified reasons, Mr. Wilson, Mr. Kapani and ECS were all well aware that Ms. Marsteller had been responsible for one of the largest contracts that ECS had at the time, and that ECS owed her a commission and/or bonus equal to 1% of the value of the USPS NCSC contract she had secured for ECS.

125.   Rather than pay Ms. Marsteller the money she had earned by being the Officer in Charge and Capture Manager bringing in this contract, and which had been promised to her as a component of her compensation, ECS, through Mr. Wilson and Mr. Kapani, terminated Ms. Marsteller instead, so they could avoid paying Ms. Marsteller her promised, earned, but unpaid compensation.

126.   Defendants' failure to pay Ms. Marsteller her earned compensations in violation of Va. Code § 40.1-29.

127.   To date, Defendants have failed to pay Ms. Marsteller her earned bonus, which should have been paid to her on or about December 24, 2011.

128.   The concerted actions of ECS, Mr. Kapani and Mr. Wilson were willful, intentional, malicious, reckless, and evinced a conscious disregard for the rights of Ms. Marsteller, and were aimed specifically and maliciously at causing damage to Ms. Marsteller, and did cause Ms. Marsteller injury and damage.

129.    As a direct and proximate result of the actions of Defendants, Ms. Marsteller has suffered and continues to suffer damages including loss of past and future of income, loss of use of income, opportunities, benefits, and other past pecuniary losses and future pecuniary losses.

130.    Due to the severity of the conduct of Mr. Kapani and Mr. Wilson, Ms. Marsteller is also entitled to punitive damages.

**COUNT FIVE – ACTUAL FRAUD**
**(against ECS and S. Roy Kapani)**

131.    The foregoing allegations are incorporated as if realleged herein.

132.    Mr. Kapani, through Mr. Powell, assured Ms. Marsteller that, if secured the USPS NCSC business, ECS would pay Ms. Marsteller for that win in one lump sum at one percent (1%) of the total value of the contract ($155M).  The USPS NCSC win would have been one of the largest contracts ECS had ever won, and, just as important, a full and open win where the value is retained, not discounted in the valuation of a company for lines of credit or sales, and the commission from it would have compensated Ms. Marsteller for agreeing to forego her other commissions.

133.    Mr. Kapani had no intention of paying Ms. Marsteller the 1% of the USPS NCSC contract value of $155M, or $1.55 M.

134.    Mr. Kapani and ECS made misrepresentations of material fact on behalf of ECS when they told Ms. Marsteller that ECS would pay Ms. Marsteller a bonus equal to 1% of the value of the USPS NCSC contract if Ms. Marsteller was successful in her efforts to secure the business for ECS, as set forth more specifically in ¶¶ 58-59.

135.    Mr. Kapani was making a positive statement of fact and had the exact knowledge or belief that he had the power and authority to take the action promised at the time he made the statement to make it true or false.  At no time did Mr. Kapani lose the belief that he possessed the power or authority, and Ms. Marsteller had every reason to believe that Mr. Kapani had the power authority to make the statement and representations to her.

136.    The representations of material fact that Mr. Kapani made to Ms. Marsteller were false.

137.    Mr. Kapani knew the representations of material fact they made to Ms. Marsteller on behalf of ECS were false at the time he made them, and ECS had no intention of paying Ms. Marsteller 1% of the USPS NCSC contract value.  While Mr. Kapani possessed the immediate and continuing ability and power to make it true, he did not intend to carry through with the representations; instead, his intent was to induce Ms. Marsteller to forego her other commissions and to continue to provide valuable knowledge and assistance to the benefit of ECS, until ECS won the USPS NCSC business.

138.    Mr. Kapani made the representations of material fact to Ms. Marsteller intentionally and knowingly, with the present intent to deceive or mislead her and with the intent not to perform.

139.    Ms. Marsteller reasonably relied on the material representations, to her detriment.

140.    The value of 1% of the UPSP NCSC contract is approximately $1.55M.

141.    After Ms. Marsteller provided valuable input and spent considerable time and effort winning the contract, Mr. Wilson told Ms. Marsteller that bonuses would be "much less than expected" since "this year we are not making our numbers."  Ms. Marsteller questioned the truth of Mr. Wilson's statement, especially given the huge USPS win.

142.    Mr. Kapani benefitted individually from the misrepresentations and the resultant induced benefits received since the USPS NCSC win was a significant portion of the Company's annual revenue upon which his income is based.

143.    The misrepresentations and actions of ECS and Mr. Kapani were conducted with actual malice, oppressively and in a spirit of mischief, amounting to extreme overreaching, and such recklessness or gross negligence and evinced a conscious disregard for the rights of Ms. Marsteller.

144.    The actions of Mr. Kapani, taken on behalf of himself and on behalf of ECS, were taken with malice, ill will, and spite, and they evinced a conscious disregard for the rights of Ms. Marsteller.

145.    Ms. Marsteller has suffered damages as a result of ECS' and Mr. Kapani's fraud, including financial and economic losses, and non-economic damages, including inconvenience, loss of reputation, embarrassment, harassment, betrayal, frustration, and other injury to Ms. Marsteller's person and property.

146.    Due to the severity of the conduct ECS and Mr. Kapani, Ms. Marsteller is also entitled to punitive damages.

## COUNT SIX – CONSTRUCTIVE FRAUD
### (ALTERNATIVE PLEADING TO ACTUAL FRAUD)
### (against ECS and S. Roy Kapani)

147.    The foregoing allegations are incorporated as if realleged herein.

148.    Mr. Kapani, on behalf of ECS made misrepresentations of material fact, innocently or negligently, when he told Ms. Marsteller that ECS would award her 1% of the contract value of the USPS NCSC contract value, as set forth more specifically in ¶¶ 58-59.

149.    The promised 1% of the USPS NCSC contract value is $1.55M.

150.    Instead, after Ms. Marsteller spent considerable time and effort to secure the contract as Officer in Charge and Capture Manager, which was the second biggest contract award and the only Full and Open contract for ECS as of that time, ECS declared that Ms. Marsteller's services were no longer needed, just one month before ECS should have paid her a bonus on the win in the amount of $1.55M.

151.    The representations of material fact that Mr. Kapani made to Ms. Marsteller on behalf of himself and on behalf of ECS were false.

152.    Mr. Kapani made the representations of material fact to Ms. Marsteller innocently or negligently, with the intent that Ms. Marsteller rely on them.

153.    Mr. Kapani made the representations of material fact to Ms. Marsteller with the intent that she rely on the representations and to induce Ms. Marsteller to use her valuable time, knowledge and effort for the benefit of ECS to secure the lucrative contract.

154.    Mr. Kapani benefitted individually from the misrepresentations and the resultant induced benefits received, and ECS benefitted from the misrepresentations and resultant benefits received.

155.    The material misrepresentations and promises were false; Ms. Marsteller reasonably relied upon these misrepresentations and false promises innocently or negligently made, to her detriment, and which constituted constructive fraud.

156.    Ms. Marsteller has suffered damages as a result of ECS' and Mr. Kapani's fraud, including financial and economic losses, and non-economic damages, including inconvenience, loss of reputation, embarrassment, harassment, betrayal, frustration, and other injury to Ms. Marsteller's person and property.

**COUNT SEVEN -**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**
**(against S. Roy Kapani and George Wilson)**

157.    The foregoing allegations are incorporated as if realleged herein.

158.    Ms. Marsteller was a highly respected member of the senior leadership team at ECS, with an ownership interest in the company.

159.    Ms. Marsteller was the only female Account Executive at ECS and the only female member of the Leadership Team (defined as having ownership and at a level VP or above) at the time of her termination.

160.    Based on the representations, confirmations, assurances and promises made to Ms. Marsteller by Mr. Kapani, and the significant and substantial accounts and revenue brought into ECS by Ms. Marsteller, Ms. Marsteller had every reason to believe that she would continue in her current career path at ECS.

27

161.     As part of Ms. Marsteller's employment with ECS, Ms. Marsteller possessed a business expectancy with ECS of continued compensation and benefits she had earned and was entitled to in exchange for her continued work for on behalf of ECS.

162.     Ms. Marsteller had a significant probability of continued employment based upon the representations, confirmations, assurances and promises made to her by Mr. Kapani.

163.     Mr. Kapani, acting outside the scope of his employment, conspired, and acting individually, employed improper means to interfere with Ms. Marsteller's business expectancies.

164.     Mr. Kapani and Mr. Wilson employed improper methods to interfere with Ms. Marsteller's business expectations.  The "improper means" includes, but is not limited to, discriminating against Ms. Marsteller on the basis on her gender, fraudulently telling her that the Company was moving in another direction (away from her deals), when it was not, and misrepresenting the nature of her work.

165.     Mr. Wilson, acting outside the scope of his employment, conspired, and acting individually, employed improper means to interfere with Ms. Marsteller's business expectancies.

166.     In fact, Ms. Marsteller had not been focusing on 8(a) business, and of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business. Ms. Marsteller's Account Executive (male) colleagues had many more 8(a) SSOs (including recent wins at EPA).  The other (male) Account Executives with more 8(a) business than Ms. Marsteller had are all still employed.

167.     Other Account Execs, who are not female, and who did not bring in as much revenue as Ms. Marsteller, and all of whom had a less robust and qualified SSO pipeline, were not terminated.

168.     But for the improper interference of Mr. Kapani and Mr. Wilson, Ms. Marsteller would continue to realize the business expectancies as set forth in this Amended Complaint.

169.     The concerted actions of Mr. Kapani and Mr. Wilson were willful, intentional, malicious, reckless, and evinced a conscious disregard for the rights of Ms. Marsteller, were aimed specifically and maliciously at causing damage to Ms. Marsteller, and did cause Ms. Marsteller injury and damage.

170.     As a direct and proximate result of the actions of Mr. Kapani and Mr. Wilson, Ms. Marsteller has suffered and continues to suffer damages, including financial and economic losses, and non-economic damages, including inconvenience, loss of reputation, embarrassment, harassment, betrayal, frustration, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

171.     Due to the severity of the conduct of Mr. Kapani and Mr. Wilson, Ms. Marsteller is also entitled to punitive damages.

## <u>COUNT EIGHT - CIVIL CONSPIRACY</u>
### (against all Defendants)

172.     The foregoing allegations are incorporated as if realleged herein.

173.     ECS, Mr. Kapani and Mr. Wilson conspired with each other, and with others, causing financial and emotional distress and loss to Ms. Marsteller.

174.     ECS, Mr. Kapani and Mr. Wilson conspired to ensure that Ms. Marsteller would perform the work and provide the guidance, expertise and assistance needed to

capture the USPS NCSC win by making false representations and promises to her that she would be paid in for the win at one percent (1%) of the total value of the contract ($155M), which would have also compensated Ms. Marsteller for agreeing to forego her other commissions, all-the-while never intending to follow through on the representations and promises.

175.    After Ms. Marsteller spent considerable time and effort to secure the contract as Officer in Charge and Capture Manager, which was the second biggest contract award and the only Full and Open contract for ECS as of that time, ECS, through Mr. Wilson, and with the support and approval of Mr. Kapani, told Ms. Marsteller that her services were no longer needed, just one month before ECS should have paid her a bonus on the win in the amount of $1.55M.

176.    Mr. Kapani and Mr. Wilson conspired to affirmatively remain silent as to the true intent, and the intent of ECS, not to pay Ms. Marsteller her earned compensation of 1% of the value of the USPS NCSC contract win (or $1.55M) so that Ms. Marsteller would continue to work to capture the contract and, once she did so, they acted to terminate her employment.

177.    Mr. Kapani and Mr. Wilson both had individual motives for conspiring to mislead Ms. Marsteller into performing, and to remain silent as to the promises and misrepresentations made to her, and then in refusing to honor the representations made to Ms. Marsteller by ECS concerning her compensation, since the USPS NCSC win was a significant portion of ECS' annual revenue, upon which their income is based.

178.     The acts of conspiracy constituted improper methods, including conspiring to make the representations to Ms. Marsteller so she would perform the work and capture one of the largest contracts ECS had at the time.

179.     The conduct of ECS, Mr. Kapani and Mr. Wilson was for an unlawful purpose.

180.     The concerted actions of ECS, Mr. Kapani and Mr. Wilson were willful, intentional, malicious, reckless and evinced a conscious disregard for the rights of Ms. Marsteller, were aimed specifically and maliciously at causing damage to Ms. Marsteller, and did cause Ms. Marsteller injury and damage.

181.     As a direct and proximate result of the actions of Mr. Kapani and Mr. Wilson, Ms. Marsteller has suffered and continues to suffer damages, including financial and economic losses, and non-economic damages, including inconvenience, loss of reputation, embarrassment, harassment, betrayal, frustration, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

182.     Due to the severity of the conduct of Mr. Kapani and Mr. Wilson, Ms. Marsteller is also entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JACQUELINE D. MARSTELLER requests that this Court enter judgment in her favor and against Defendants ELECTRONIC CONSULTING SERVICES, INC., S. ROY KAPANI and GEORGE WILSON, jointly and severally, on the above Counts, and further:

(a)     Award Ms. Marsteller compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on each of the above-stated Counts One through Eight; and in addition

31

(b)      Award Ms. Marsteller punitive and exemplary damages, to be determined by a jury, on Count One not to exceed the statutory cap, and on Counts Four, Five, Seven and Eight, in an amount not to exceed $350,000 per Count per Defendant (the statutory cap in Virginia); and in addition

(c)      Award Ms. Marsteller the value of 1% of the USPS NCSC contract, plus interest accruing from the date the payment was due on Count Four, plus attorney's fees; and in addition

(d)      Award Ms. Marsteller appropriate front pay and back pay, including all lost income and benefits of employment both past and future; and in addition

(e)      Award Ms. Marsteller attorneys' fees and the costs of this action; and in addition

(f)      Award injunctive relief consisting of an order prohibiting Defendant ECS from engaging in further employment practices that create or tolerate a hostile or discriminatory work environment based on gender; and in addition

(g)      Award Ms. Marsteller such other and further relief as may be appropriate under the circumstances.

## <u>JURY DEMAND</u>

**PLAINTIFF JACQUELINE D. MARSTELLER DEMANDS A TRIAL BY JURY.**


May 29, 2013                                Respectfully submitted,

*/S/ CARLA D. BROWN*

Carla D. Brown
Virginia Bar No. 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
 BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile

*Counsel for Plaintiff,*
 *Jacqueline D. Marsteller*