**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| JACQUELINE D. MARSTELLER )<br><br>    Plaintiff, )<br><br>    v. )<br><br>ECS FEDERAL, INC. )<br>f/k/a ELECTRONIC CONSULTING )<br>SERVICES, INC., )<br><br>    Defendant. ) | C.A. No. 1:13cv593<br>(JCC/JFA) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF MOTION TO DISMISS COUNTERCLAIMS**

Plaintiff, Jacqueline D. Marsteller ("Ms. Marsteller"), by counsel, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, hereby offers this Memorandum in support of her motion to dismiss the Counterclaims filed against her by the Defendants, ECS Federal Inc. ("ECS"), S. Roy Kapani ("Mr. Kapani") and George Wilson ("Mr. Wilson").

**SUMMARY OF ARGUMENT**

Defendant/Counter-Plaintiff ECS has sought to retaliate against Ms. Marsteller for filing her gender discrimination claims by falsely that Ms. Marsteller misappropriated ECS trade secrets while still employed by ECS. Although ECS provides significant detail as to the files allegedly misappropriated, ECS' counterclaims utterly fail to allege any use of disclosure of these trade secrets by Ms. Marsteller, the requisite intent, or any damages sustained by ECS as a result. Each of ECS' counterclaims is either precluded by ECS' own pleadings, or otherwise fail to state a claim as a matter of law.

First, ECS' claim for violation of the Virginia Uniform Trade Secrets Act (Count I) fail to establish either trade secret status for all of the documents allegedly misappropriated, or that Ms. Marsteller used or disclosed the alleged trade secrets with the requisite intent.  ECS' attempt to infer wrongdoing is not supported by its own pleading, and cannot form the basis of a misappropriation claim.

Should this Court find a viable VUTSA claim, the pre-emption clause of the VUTSA would then preclude ECS' counterclaims under the Virginia Computer Crimes Act (Count II) and Conversion (Count IV).  ECS has plead that *every* piece of information allegedly misappropriated is trade secret; as a result, any civil claim premised on the misappropriation of the same information is pre-empted by statute.  ECS has not alleged any additional, independent facts which would support a VCCA or conversion claim, and Counts II and IV must therefore also be dismissed.

With regards to ECS' breach of contract (Count III) and breach of fiduciary duty (Count V) claims, ECS has failed to plead use and disclosure of the allegedly misappropriated information sufficient to meet the pleading standard under Rule 8 and *Iqbal/Twombly*, and has also alleged no cognizable damages as a result of any alleged misappropriation.  These claims cannot stand on ECS' pure speculation and conclusory allegations.

Finally, ECS' unjust enrichment (Count VI) must be dismissed for failing to show that Ms. Marsteller owed any duty or payment to ECS in exchange for her 2011 bonus payment, and for being an unavailable claim due to the existence of an express contract that speaks to the same matter.  More specifically, ECS' pleading states that Ms. Marsteller requested that her effective termination date take place before December 31,

2011, which by ECS' own policies should have made Ms. Marsteller ineligible for any bonus. ECS agreed to Ms. Marsteller's early termination, but *unilaterally* decided to grant Ms. Marsteller a bonus; no agreement was made that Ms. Marsteller would have to confer *any* benefit upon ECS in order to receive her bonus. Furthermore, ECS has clearly pled that an express agreement governs the matter of misappropriation, namely the Proprietary Information Agreement that forms the basis of ECS' breach of contract claim. ECS cannot recover for unjust enrichment where an express agreement exists.

In sum, ECS has failed to sufficient plead all the elements required for each of its counterclaims, or has plead claims that are precluded by ECS' own allegations. Ms. Marsteller therefore respectfully requests this Court dismiss ECS' counterclaims to the full extent warranted by law.

## **FACTUAL BACKGROUND**

Ms. Marsteller began her employment with ECS on November 30, 2006 as a Senior Vice President in the IT Services Group, and in after a re-organization in July, 2011, Ms. Marsteller became a Senior Vice President and Account Executive working in the Corporate Development Department. Amended Complaint ("Am. Compl.") ¶ 33. Ms. Marsteller performed well and received annual awards of salary increases and/or bonuses, received excellent performance evaluations, and bonuses for her performance and revenue brought into ECS. Am. Compl. ¶¶ 35-36. Over the course of Ms. Marsteller's employment at ECS, Ms. Marsteller has been the Officer in Charge of winning roughly $240,000,000 in projected revenue and backlog (the contractually stated contract/task order value including base year(s) and options), with a Spring 2011 $155,000,000 USPS contract win that was a Full and Open Large Business Competition

(the only single award Full and Open win and the second largest single award contract that ECS had ever received at that time), and a coveted Full and Open Government Wide Acquisition Contract (GWAC) award made after her termination.  Am. Compl. ¶37.

Ms. Marsteller participated in an annual bonus program which was based on a percentage of her salary (ranging from 30% to 100%) dependent upon revenue, number of proposals her group submitted, profit, and customer satisfaction goals (both at the corporate and division levels).  Am. Compl. ¶38.  The average score on all contracts for Ms. Marsteller's customer satisfaction rankings over the years, as indicated by quarterly project reviews, ranged from nine to ten, on a ten point scale.  Am. Compl. ¶40.

Throughout Ms. Marsteller's employment, and at the time of her termination, Ms. Marsteller was the highest ranking female at ECS, and the only female executive (at the level of Vice President or above) at ECS.  Am. Compl. ¶39.

Ms. Marsteller was hired after being heavily recruited by Mr. Kapani.   At the time, Ms. Marsteller was interested in expanding her own business (Marstar) through subcontracting opportunities with ECS rather than becoming a full time employee of ECS.  In order to persuade Ms. Marsteller to lend her expertise to ECS, Mr. Kapani and Anthony Schulien, the CFO, offered to pay Ms. Marsteller the equivalent of one year of her Marstar salary if she secure new Federal Government services contracting business that would generate revenue equal or greater than the fully burdened rate for five Full Time Equivalents.  Am. Comp. ¶¶ 41-43.  While working in this capacity, Mr. Marsteller performed well and contributed to a number of contract wins involving the Department of Labor ("DOL") and the United States Department of Agriculture ("USDA") – both clients/customers Ms. Marsteller had been involved with at her previous place of

employment, and as a in October of 2006 Ms. Marsteller was and offered her a full time

position with ECS.   Am. Compl. ¶¶ 44-45.  Ms. Marsteller was offered a robust bonus

plan and "ownership" in the company equal to 3% of the value of the company if ECS

was sold.  Am. Compl. ¶46.

After Ms. Marsteller joined ECS, Scott Weaver ("Mr. Weaver") was hired to run

the Business Development, and ECS' business model changed as Mr. Weaver took

responsible for all business development functions with limited support from executives

in the Operations Departments such as Richard August ("Dr. August") and Ms.

Marsteller.  Dr. August and Ms. Marsteller, as the two most experienced Operations

executives, were responsible for writing proposals.  Am. Compl. ¶ 49.  During this time,

Mr. Kapani often visited Dr. August and Mr. Weaver, Ms. Marsteller's male

counterparts, when Jeffrey Powell (ECS' Executive Vice President, and Ms. Marsteller's

direct supervisor at the time) as out of the office on travel but rarely did the same with

Ms. Marsteller.  Am. Compl. ¶ 50.

In March of 2009, Ms. Marsteller spoke to Mr. Powell regarding her concerns

with the business pipeline, and the fact it did not have business that would support each

of the business unit's revenue targets.  Mr. Powell explained that he and Mr. Kapani

thought it was the "best pipeline ever," and further stated that it was not Ms. Marsteller's

job to worry about it.  Am. Compl. ¶ 51.

In the fall of 2010, Ms. Marsteller learned that an offer had been made to

purchase ECS.  Since the amount was less than Mr. Kapani had expected, and the focus

changed to increasing the value of the company, especially by winning "full and open"

work.  Ms. Marsteller had been focused on two full and open opportunities, doing "pre-

proposal preparation" for a large United States Postal Service National Customer Support Center (USPS NCSC) opportunity, and a full and open Government Wide Acquisition contract (GWAC) with HHS, CIO-SP3.  Historically, Mr. Kapani and ECS placed great value on GWAC vehicles, and this one is used more by DOD than any other agency. Am. Compl. ¶ 55.

        In December 2010, during bonus discussions, Mr. Kapani changed the terms of Ms. Marsteller's bonus plan, stating that he did not believe Ms. Marsteller should be compensated for revenues secured under existing ECS contracts that she had been responsible for winning, but which she no longer managed due to the formation of a new business unit.  Ms. Marsteller took exception to this, explaining that this was not appropriate given the bonus program that had been offered to her, and which Ms. Marsteller accepted as part of her compensation.  In addition, Ms. Marsteller remained the "Officer in Charge" responsible for winning this work and had been the primary person responsible for writing these proposals. Am. Compl. ¶56.  Mr. Kapani agreed to continue to include the United States Department of Agriculture (USDA) Farm Services Agency (FSA) contract task orders in Ms. Marsteller's bonus program for 2010, but Ms. Marsteller was forced to forego the bonuses associated with the GNMA contract. Although Ms. Marsteller had worked over Christmas holiday on the proposal to ensure a contract was in place to cover staff, Mr. Kapani took the position that he was the one responsible for the initial contract win years before, so therefore he refused to count it, unilaterally changing the terms of this portion of Ms. Marsteller's compensation.  Am. Compl. ¶57.

During this bonus discussion, Ms. Marsteller asked about the potential award of the USPS contact given the fact that Mr. Kapani evidently felt he could reorganize or change her bonus plan at any time.  Mr. Powell said that Mr. Kapani authorized him to assure Ms. Marsteller that if she secured the USPS NCSC business, ECS would pay Ms. Marsteller for the win in one lump sum at one percent (1%) of the total value of the contract ($155M).  Am. Compl. ¶58.  Mr. Powell explained that ECS had entered into a similar agreement for Stanley Goodwin when ECS won the Army PEO STRI work.  Am. Compl. ¶ 59.

In June 2011, Mr. Powell informed Ms. Marsteller and Dr. August of a new "capture management" role and explained that it would help ECS to achieve a new goal of for annual revenue in three years prior to selling the company.  Mr. Kapani said that as owners, they would all benefit from the resulting increased value and sales price of the company.  Although  Dr. August and Ms. Marsteller objected to the Capture Manager classification, which appeared to be a demotion (a junior business developer was the only other individual to hold this classification), Mr. Kapani reassured them about their leadership and ownership roles in the company.  Am. Compl. ¶¶ 60-62.  During this same discussion, Mr. Powell informed Ms. Marsteller and Dr. August that the bonus plan would change as part of the reorganization.  Am. Compl. ¶64.

On or around April 4, 2011, while Ms. Marsteller was still employed at ECS, ECS announced the successful capture of the USPS NCSC business, a contract valued at $155M.  Ms. Marsteller was credited with the win based on her significant efforts resulting in the capture.   Am. Compl. ¶ 65.  Based on Mr. Kapani's representations that Ms. Marsteller would be awarded 1% of the USPS NCSC contract award, Ms. Marsteller

was entitled to a bonus in the amount of $1.55M.  Am. Compl. ¶ 66.  Since bonuses were traditionally paid in late December (Christmas week) at ECS, Ms. Marsteller had no reason to believe she would not receive her bonus of $1.55M for the USPS NCSC contract in December 2011.  Am. Compl. ¶ 67.

On October 21, 2011, Ms. Marsteller met with Mr. Wilson after a Friday morning meeting and asked what, if anything, she should be doing differently. Mr. Wilson told Ms. Marsteller she was doing everything right, and told her to just keep doing what she was doing, or words to that effect.  By October 26, 2011, Ms. Marsteller was making progress on opportunities in her pipeline, establishing contacts, and moving forward. Am. Compl. ¶¶ 68-69.  Around this same time, Ms. Marsteller received a letter from Mr. Kapani informing her that she had received a 1% salary increase.  Am. Compl. ¶ 71.

On November 3, 2011, Ms. Marsteller attended a meeting conducted by Mr. Wilson.  At that time, Mr. Wilson told Ms. Marsteller, "We don't see this working out with you," and stated that Ms. Marsteller was not "senior enough" to be a Senior VP in the Account Exec role (demonstrating Mr. Wilson's perception that Ms. Marsteller, as the only female member of the Senior Executive Team, was not as "senior" as her male colleagues. Am. Compl. ¶¶ 72-73.  Mr. Wilson also said Ms. Marsteller was not skilled in accounts or other areas the company was moving into, such as DOD agencies.  He referred to Ms. Marsteller's expertise and business area focus as "low level, help desk, up for grabs every five years."  He said the company wanted more Systems Engineering and Technical Assistance (SETA) work.   In fact, Ms. Marsteller had been responsible for one of the largest contracts that ECS had at the time.  Am. Compl. ¶ 74.  Mr. Wilson told Ms. Marsteller that she would be "out" by the end of the year, but that Ms. Marsteller could

announce her departure has having been her decision so that it would appear voluntary. Mr. Wilson claimed ECS "wanted this to be seen as a win/win" and was interested in hiring Ms. Marsteller as a consultant to ECS after her termination, effective Dec. 31, 2011.  Am. Compl. ¶¶ 75-76.

When Ms. Marsteller asked about her expected and earned bonus on the USPS contract, Mr. Wilson told Ms. Marsteller that bonuses would be "much less than expected" since "this year we are not making our numbers."  Ms. Marsteller questioned the truth of Mr. Wilson's statement, especially given the huge USPS win.  Am. Compl. ¶ 77.

Ms. Marsteller was the only female Account Executive at ECS and the only female member of the Leadership Team (defined as having ownership and at a level VP or above).  Am. Compl. ¶ 78.

Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to women owned and small businesses.  In fact, Ms. Marsteller had not been focusing on 8(a) business.  Of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business. Am. Compl. ¶¶ 80-81. In fact, Ms. Marsteller's (male) Account Executive colleagues and Business Development peers (Scott Weaver) handled much more 8(a) business (including recent wins at EPA).  They remained employed at ECS at the time of Ms. Marsteller's termination.  Am. Compl. ¶ 82.

Ms. Marsteller's male colleagues, who brought in less revenue, and all of whom had a less robust and qualified pipeline, were not terminated.  Meanwhile, ECS continued

to pursue business in Ms. Marsteller's pipeline and other areas of expertise.  Am.Compl. ¶¶ 83-84.  Significantly, in sharp contract to the stated (false) reason for her termination, ECS's website lists Ms. Marsteller's areas of practice as its top Service area under Solutions, IT Infrastructure Support, and Federal Civilian is still listed as one of ECS's three markets.  Am. Compl. ¶ 84.

Ms. Marsteller had much more experience than her male counterparts in the area of account management and business development, made significant contributions in 2011, and exceeded Division objectives.  Yet, she was terminated and her male colleagues were not.  Am. Compl. ¶ 85.

At the time of her termination, Ms. Marsteller was the only Account Executive or Business Development person who had meet their Annual Goals and Objectives.  Am. Compl. ¶ 86.

At the time of her termination (and as of today), ECS had not paid Ms. Marsteller her bonus on the amount of 1% of the value of the USPS NCSC contract, or $1.55M. Am. Compl. ¶ 87.

ECS has not contended, and cannot contend, that it suffered any plausible damages as a result of Ms. Marsteller's alleged activities, or that Ms. Marsteller profited from access to any of her former employer's information.

## **ARGUMENT**

**I.      ECS Fails To Sufficiently Allege Trade Secret Status or Use of Trade Secrets In Supports of Its Virginia Uniform Trade Secrets Act Claim**

To establish a claim under the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code Ann. §§ 59.1-336 to 343, a plaintiff must prove that (1) the information in question constitutes a trade secret; and (2) the defendant misappropriated it.

*MicroStrategy, Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004)

(Friedman, J.).  "Trade secret" is defined as:

> "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Va. Code. Ann. § 59.1-336 (2008).  Misappropriation, in turn, is defined as:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
2. Disclosure or use of a trade secret of another without express or implied consent by a person who
   a. Used improper means to acquire knowledge of the trade secret; or
   b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
      1) Derived from or through a person who had utilized improper means to acquire it;
      2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
      3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
      4) Acquired by accident or mistake.

*Id.*

Here, Defendants have contended that Ms. Marsteller misappropriated several documents from ECS' servers prior to her separation in December 2012.  Defendants' factual allegations, however, fail to support a claim of misappropriation of trade secrets.

First, many of the documents alleged to be "trade secret" by Defendants do not, but the very terms of the Counterclaim, meet the high standard required to be considered trade secret.  More specifically, Defendants have claimed trade secret status for certain documents which detail the current staffing, billing, cost, and technical information relating to ECS' USPS NCSC contract, but fully admit that the value of the information

11

would be limited to competitor seeking to bid against ECS in any *re*-competition of the same contract; any such re-competition cannot occur for several years, by which time all of the staffing, billing, cost, and technical information will be obsolete.  *See Countercl.* ¶ 7.a ("This information…[would] give the competitor an unfair pricing advantage to bid against ECS in a re-competition for any subsequent or future contract since the USPS is a very price sensitive customer"); ¶ 7.b ("This confidential information can be used by a competitor to bid against ECS in a re-competition"); ¶ 7.c ("Information contained in this plan is confidential and would aid a competitor in writing a technical proposal to bid against ECS in a re-competition"); ¶ 7.d ("The Metrics for the USPS NCSC contact [sp], which would also aid a competitor in writing a technical proposal in competition with ECS"); ¶ 7.g ("This information is not known to the public and would provide an unfair competitive advantage to competitors and cause irreparable harm to ECS").  These documents – the wage list for the USPS NCSC contract, invoice showing the hours worked on the USPS NCSC contract, USPS NCSC Quality Control Plan, USPS NCSC Metrics, Pipeline Review documents, and Waterfall Report – do not have independent economic value, and could not be used for economic gain by any of ECS' current competitors.

Second, ECS fails to allege that Ms. Marsteller used the allegedly trade secret information, or that she did so with knowledge that the information was confidential. Although ECS alleges that Ms. Marsteller was required to sign a Proprietary Information Agreement, *Countercl.* ¶ 12, it does not follow – and ECS does not allege – that Ms. Marsteller knew, at the time of the alleged misappropriation, that the alleged trade secrets were confidential or otherwise use the secrets.  ECS also does not allege that most of the

alleged trade secrets were ever used, and does not allege facts sufficient to satisfy the knowledge element of the VUTSA anywhere in its pleadings. *See East West, LLC v. Rahman*, 873 F. Supp. 2d 721, 735-736 (E.D. Va. 2012) (dismissing VUTSA claim where plaintiff "fail[ed] to allege how Defendants have used this information or that they did so knowing that the information was confidential.")  ECS' allegation that their trade secret information must have been used by Ms. Marsteller and her new employer, Ausley, is based on pure speculation and cannot meet the pleading standards required under *Iqbal/Twombly*.

ECS' insistence that Ms. Marsteller must have used trade secret information because Ausley achieved ISO certification also ignores the well-established principle that an employee may use experience gained during the course of her employment after her separation.  "The protection afforded to confidential information should reflect a balance between an employer who has invested time, money, and effort into developing such information and an employee's general right to make use of knowledge and skills acquired through experience in a field or industry for which he is best suited." *Lasership, Inc. v. Watson*, 79 Va. Cir. 205, 215 (Fairfax 2009).  Ms. Marsteller was entitled to use any experience and knowledge she gained during the course of her employment with ECS later on in her career, including to obtain ISO certification for her new employer. ECS cannot create a misappropriation of trade secrets claim without any evidence of actual misuse of its trade secrets.

As ECS cannot show that any of the alleged trade secrets are entitled to trade secret status, and because ECS has not adequately alleged that Ms. Marsteller used any

ECS trade secrets with the requisite intent, Ms. Marsteller respectfully requests this Court dismiss ECS's claims under the Virginia Uniform Trade Secrets Act.

## II.    ECS' Virginia Computer Crimes Act and Conversion Claims Are Pre-empted by the Virginia Uniform Trade Secret Act

ECS has improperly sought multiple theories of recovery premised on the same misappropriation of trade secrets.  Should this Court find that ECS has properly stated a claim for misappropriation of trade secrets under the VUTSA, ECS' claims for violation of the Virginia Computer Crimes Act ("VCCA") and conversion are necessarily preempted by the VUTSA.

Va. Code Ann. § 59.1-341 states that the cause of action created under VUTSA "displaces conflicting tort, restitutionary, and other law of this Commonwealth [which provide] civil remedies for misappropriation of a trade secret." "The VUTSA preemption provision is intended to prevent inconsistent  theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret. *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd*., 859 F. Supp. 2d 771, 782 (E.D. Va. 2012) (*citing Smithfield Ham and Prod. Co. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D.Va. 1995)) (internal quotations omitted).  "[O]nly those distinct theories of relief that are supported by facts unrelated to the misappropriation of the trade secret may escape preemption under the VUTSA." *Id.*

Here, ECS has asserted trade secret status over all of the information Ms. Marsteller allegedly misappropriated.  *Countercl.* ¶ 28 ("The management system documents developed by ECS to obtain ISO certification, the ECS Capture Plan and Capture Plan Templates, Pipeline review documents, and other confidential information

14

derive independent economic value from not being generally known outside of ECS and are not readily accessible by proper means. **This information constitutes trade secrets of ECS**"); ¶ 36 ("Ms. Marsteller's use of the ECS computer system to make unauthorized copies of ECS' confidential, proprietary and trade secret documents constitutes a violation of Va. Code Ann. § 18.2-152.4, as authorized by § 18.2-152.12"); ¶ 46 ("In copying ECS's confidential and proprietary information without authority and maintaining such information after the termination of her employment with ECS, Ms. Marsteller wrongfully exercised dominion and control over such property inconsistent with the rights of ECS.")  In other words, ECS's VCCA and conversion claims are "predicated entirely upon [the defendant's] misappropriation of trade secrets."  *E.I. DuPont v. Kolon Industries*, 688 F. Supp. 2d 443, 452 (E.D. Va. 2009); *see also MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1364 (Fed. Cir. 2005) (ruling that the district court properly applied the preemption clause because "[the plaintiff] set forth two theories that both depend upon the misappropriation of a trade secret, *not* a misappropriation theory and an independent and alternative conspiracy theory.")

The VUTSA pre-emption provision therefore must apply to all of the information Ms. Marsteller allegedly misappropriated, thereby pre-empting additional VCCA or conversion claims for misappropriation of the same information.  ECS simply may not recover twice for the same act.  ECS' exclusive remedy lies with the Virginia Uniform Trade Secrets Act, and as ECS alleges no grounds for its VCCA or conversion claims aside from the misappropriation of trade secrets, these claims should be dismissed.

**III.    ECS Has Failed to Sufficiently Allege a Breach of Contract or Damages Resulting from a Alleged Breach of Contract**

15

The well-established elements of a breach of contract claim in Virginia are: (1) a legally enforceable obligation of a defendant to the plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004). ECS is unable to support of its breach of contract claim with any factual allegations that Ms. Marsteller either used and disclosed ECS' proprietary information in violation of the Proprietary Information Agreement, or that ECS has sustained any damages stemming from any such breach of the Information Agreement.

First, ECS' allegations that Ms. Marsteller has "used and disclosed" any ECS proprietary information is utterly speculative.   While ECS has detailed its forensic efforts to show that Ms. Marsteller downloaded ECS files while still employed with ECS, the counterclaims lack a single factual allegation that Ms. Marsteller used or disclosed any of that information after her separation from ECS.  At most, ECS urges this Court to infer that some – not all – ECS proprietary information was used or disclosed in order for Ms. Marsteller's new employer, Ausley, to obtain ISO certification six full months after Ms. Marsteller's separation from ECS.  *Countercl.* ¶¶ 22-25.  ECS does not explain how any of the non-ISO related documents allegedly misappropriated by Ms. Marsteller have been used or disclosed, or even how the ISO management system document files allegedly misappropriated would have assisted Ms. Marsteller in obtaining ISO certification for Ausley.  ECS even admits its lack of knowledge in its pleading, acknowledging that its basis for this claim is based on nothing more than Ms. Marsteller's existing access to ECS files during the time of her employment, her position title with her new employer, and "the timing of Ausley's obtaining ISO certification." *Countercl.* ¶ 25.  At best, the

counterclaims infer a breach of contract by Ms. Marsteller as to the ISO management system documents, but no other documents; at worst, this pleading is conclusory, fails to satisfy the pleading requirements imposed by *Iqbal/Twombly*, and should be dismissed.

Furthermore, ECS has failed to state any cognizable damages resulting from Ms. Marsteller's alleged use and disclosure of proprietary information.  ECS' claim that it has lost the value of materials and "royalty payments" for the "use and disclosure" of such documents is not supported by its own pleading, in which no factual use or disclosure is alleged, nor does ECS provide any value as to the materials allegedly misappropriated or the existing royalty value of such materials.  *Countercl.* ¶ 44.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Here, ECS has failed to allege facts in support of each element of its breach of contract claim, and its claim should be dismissed.

### IV.   ECS Has Failed to Allege Damages Resulting From a Breach of Fiduciary Duty

In order to maintain a breach of fiduciary duty against Ms. Marsteller, ECS must show that an independent, common law fiduciary duty existed between the parties, that the duty was breached, and that ECS sustained damages as a result. *Carstensen v. Chrisland Corp.*, 247 Va. 433, 444, 442 S.E.2d 660 (1994). Although Virginia law has "long recognized that under the common law an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment," a review of ECS' counterclaims shows that ECS has sustained anything more than speculative and conclusory damages, or

that Ms. Marsteller committed any clear breaches of duty while employed by ECS. *Williams v. Dominion Tech. Partners, L.L.C*., 265 Va. 280, 289, 576 S.E.2d 752 (2003).

A breach of fiduciary duty is not available to every "disgruntled player in the rough-and-tumble world comprising the competitive marketplace," but must be premised upon clear breaches of duty.  *ITT Hartford Group, Inc. v. Virginia Financial Assocs., Inc*., 258 Va. 193, 204, 520 S.E.2d 355 (1999). "[I]n the absence of a contract restriction regarding this duty of loyalty, an employee has the right to make arrangements during his employment to compete with his employer prior after resigning his post." *Williams v. Dominion Tech. Partners, LLC*, 265 Va. 280, 289 (2003). *See also Feddeman & Co. v. Langan Assocs.*, P.C., 260 Va. 35, 42 (2000) ("[P]rior to resignation, [] defendants were entitled to make arrangements to resign, including plans to compete with their employer, and that such conduct would not ordinarily result in liability for breach of fiduciary duty.").  Furthermore, "the courts must be mindful that the fact that particular conduct of an employee caused harm to his employer does not establish that the conduct breached any duty to the employer."  *Williams v. Dominion Tech. Partners, LLC*, 265 Va. 280, 290 (2003).

Here, ECS' breach of fiduciary duty claim is based entirely upon Ms. Marsteller's alleged access and downloading of ECS information while she was still in ECS' employ. ECS' allegations regarding damages resulting from any such breach are utterly conclusory, however, and fail to meet the pleading standards set by Federal Rule of Civil Procedure 8(a) and *Iqbal/Twombly*.

## V.    ECS Has Failed to Show Ms. Marsteller Was Unjustly Enriched, and its Claim is Precluded by the Existence of an Express Contract

In order to recover for unjust enrichment, ECS must show that "(1) he conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the

18

benefit without paying for its value." *Schmidt v. Household Finance Corp*., 276 Va. 108, 661 S.E.2d 834, 838 (2008).  A cause of action for unjust enrichment in Virginia "rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another." *Kern v. Freed Co*., 224 Va. 678, 299 S.E.2d 363, 365 (1983) (internal quotation marks omitted); *see Nossen v. Hoy*, 750 F. Supp. 740, 744 (E.D. Va. 1990).  Here, ECS has failed to state a claim for unjust enrichment, as the counterclaim pleading shows that Ms. Marsteller was no longer employed by ECS – and owed no duty to ECS – at the time ECS granted her the 2011 bonus payment.  Furthermore, any unjust enrichment claim based upon alleged misappropriation of ECS information is precluded by an express contract governing the same matter, the Proprietary Information Agreement.

First, ECS' own pleading shows that Ms. Marsteller was willing to forego the bonus payment in exchange for an early termination from ECS, and that ECS agreed. The facts as alleged demonstrate that ECS received absolutely no benefit from Ms. Marsteller following December 9, 2011, and that Ms. Marsteller requested that her effective termination be December 15, 2011, which would have deprived her from any bonus payment.  The counterclaim states:

- "Ms. Marsteller's last day of employment with ECS was scheduled to be December 31, 2011.  I was scheduled by ECS in this manner so that Ms. Marsteller would be eligible to receive the 2011 award incentive bonus payment.  In order to receive the payment, a employee must be employed on the last day of the calendar year.  Although **Ms. Marsteller stopped reporting to work at the ECS offices by December 9, 2011**, ECS considered her to remain employed."  Countercl. ¶ 16 (emphasis added).

- "On December 20, 2011, **Ms. Marsteller contacted ECS and requested that her effective termination date be December 15, 2011.**  Presumably she asked for this change so that she could accept employment with her current employer…" *Countercl*. ¶ 17 (emphasis added.)

- "**ECS agreed to the request**, and advised Ms. Marsteller in writing that **notwithstanding the effective termination date of December 15, 2011, she would remain eligible to receive 2011 award incentive bonus payment** in the total amount of $94,986.00." *Countercl.* ¶ 18.

Nowhere in the counterclaim does ECS allege that Ms. Marsteller should have reasonably expected to perform any tasks in exchange for the bonus payment after her termination, or that Ms. Marsteller unjustly accepted the benefit of the bonus payment without performing some commensurate work.  ECS has alleged that Ms. Marsteller requested to be terminated early, and that it was ECS, *not* Ms. Marsteller, that decided to confer the 2011 bonus payment to Ms. Marsteller despite Ms. Marsteller no longer being with the company (in violation of its own policies).

Second, to the extent that ECS seeks to base its unjust enrichment claim on Ms. Marsteller's alleged misappropriation of confidential and proprietary information, ECS' unjust enrichment claim is barred by the existence of a written contract.  "[A] party may not recover for claims sounding in quasi-contract or unjust enrichment when an express or implied contract already governs its relationship with a defendant." *Federal Deposit Ins. Corp. v. S. A. S. Associates*, 44 F. Supp. 2d 781, 787 (E.D. Va. 1999), *aff'd* 214 F.3d 528 (4th Cir. 2000).  Here, ECS specifically pleads:

> At the time of the payment ECS was not aware that Ms. Marsteller had misappropriated its confidential and proprietary information **and had breached her contractual and fiduciary obligations**.  Had ECS known that Ms. Marsteller misappropriated such information, it would not have considered Ms. Marsteller's employment to have continued until December 31, 2011, it would have terminated her immediately and not paid the 2011 award incentive bonus.

*Countercl.* ¶ 21.  Although hindsight may be 20/20, ECS' regret over its course of action cannot change the fact that an express contract – the Proprietary Information Agreement forming the basis of ECS' breach of contract claim – governs any alleged

20

misappropriation of ECS information.  "It has been well settled…that an express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing he same subject mater [and where] the rights of the parties are to be determined by the provision of the express contract…the law will not imply an agreement in contravention thereof."  *Southern Biscuit Co. v. Lloyd*, 6 S.E.2d 601, 606, 174 Va. 299 (1940); *see also Royer v. Bd. of County Supervisors*, 10 S.E.2d 876, 881, 176 Va. 268, 280 (1940) ("[W]here there is an expressed and enforceable contract in existence which governs the rights of the parties, the law will not imply a contract in contravention thereof.")  ECS has not plead its unjust enrichment claim in the alternative to its breach of contract claim, and unjust enrichment is therefore not available as an additional claim.  *Southern Biscuit*, 6 S.E.2d at 606, 174 Va. at 311; *see also Frank Brunckhorst Co. v Coastal Atl.*, 542 F. Supp. 2d 452, 465066 (E.D. Va. 2008) (holding unjust enrichment counterclaim to be legally insufficient where defendant repeatedly claimed that parties had an express contract and did not allege in the unjust enrichment claim that the parties did not have a contract.)

## CONCLUSION

For the reasons above, Defendant requests this motion be dismissed for failing to state a plausible basis of recovery, failing to identify recoverable damages, for legal theories that contravene well-established Virginia law, and for CEB's inability to state a cause of action respecting the claims it alleged.   Defendant further requests his fees and costs associated with responding to Plaintiff's Complaint, and all other relief this Court finds just and equitable.

July 17, 2013                     Respectfully submitted,

                                 */S/ CARLA D. BROWN*

                                 Carla D. Brown
                                 Virginia Bar No. 44803
                                 cbrown@cbcblaw.com
                                 CHARLSON BREDEHOFT COHEN & BROWN, P.C.
                                 11260 Roger Bacon Drive, Suite 201
                                 Reston, Virginia 20190
                                 Telephone:  (703) 318-6800
                                 Facsimile:  (703) 318-6808

                                        *Counsel for Plaintiff/Counter-Defendant,*
                                          *Jacqueline D. Marsteller*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July 2013 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

                    Michael E. Barnsback, Esq.
                    LeClair Ryan
                    2318 Mill Road, Suite 1100
                    Alexandria, VA  22314
                    (703) 647-5931 Telephone
                    (703) 647-5993  Facsimile
                    Michael.barnsback@leclairryan.com
                    *Counsel for Defendants ECS Federal, Inc.,*
                      *S. Roy Kapani and George Wilson*

                         */S/ CARLA D. BROWN*
                         _____
                         Carla D. Brown
                         Virginia Bar No. 44803
                         cbrown@cbcblaw.com
                         CHARLSON BREDEHOFT COHEN
                           BROWN & SAKATA, P.C.
                         11260 Roger Bacon Drive, Suite 201
                         Reston, Virginia 20190
                         (703) 318-6800  Telephone
                         (703) 318-6808  Facsimile

                         *Counsel for Plaintiff/Counter-Defendant,*
                         *Jacqueline D. Marsteller*