## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| JACQUELINE D. MARSTELLER )<br><br>　　　Plaintiff, )<br><br>v. )<br><br>ECS FEDERAL, INC. )<br>f/k/a ELECTRONIC CONSULTING )<br>SERVICES, INC., )<br><br>　　　Defendant. ) | C.A. No. 1:13cv593<br>(JCC/JFA) |

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S
### MOTION TO COMPEL DISCOVERY AND OVERRULE OBJECTIONS

Plaintiff Jacqueline D. Marsteller, by counsel, has moved this Court, pursuant to Fed. R.

Civ. P. 37, for an Order overruling the objections of Defendant ECS Federal, Inc. and

compelling Defendant to respond fully and completely to certain of Plaintiff's discovery

requests.

### SUMMARY OF ARGUMENT

Plaintiff seeks documents relevant to her claims against ECS, including Pipeline documents,

Capture documents, and other items, which underscore that her termination was discriminatory as it

followed her securing ECS' second largest contract award and she received notice of her

termination just two weeks after receiving a raise.

Plaintiff further seeks documents that Defendants rely upon in their claims against her.

## CERTIFICATE PURSUANT TO RULE 26(c)

Counsel for Plaintiff hereby certifies that counsel have made good faith efforts to discuss this motion. This Motion addresses discovery sought by Plaintiff about which counsel were unable to reach agreement.

## FACTUAL BACKGROUND

Ms. Marsteller began her employment with ECS on November 30, 2006 as a Senior Vice President in the IT Services Group, and in after a re-organization in July, 2011, Ms. Marsteller became a Senior Vice President and Account Executive working in the Corporate Development Department. Amended Complaint ("Am. Compl.") ¶ 33. Ms. Marsteller performed well and received annual awards of salary increases and/or bonuses, received excellent performance evaluations, and bonuses for her performance and revenue brought into ECS. Am. Compl. ¶¶ 35-36. Over the course of Ms. Marsteller's employment at ECS, Ms. Marsteller has been the Officer in Charge of winning roughly $240,000,000 in projected revenue and backlog (the contractually stated contract/task order value including base year(s) and options), with a Spring 2011 $155,000,000 USPS contract win that was a Full and Open Large Business Competition (the only single award Full and Open win and the second largest single award contract that ECS had ever received at that time), and a coveted Full and Open Government Wide Acquisition Contract (GWAC) award made after her termination. Am. Compl. ¶37. Ms. Marsteller participated in an annual bonus program which was based on a percentage of her salary (ranging from 30% to 100%) dependent upon revenue, number of proposals her group submitted, profit, and customer satisfaction goals (both at the corporate and division levels). Am. Compl. ¶38. The average score on all contracts for Ms. Marsteller's customer satisfaction rankings over the

years, as indicated by quarterly project reviews, ranged from nine to ten, on a ten point scale. Am. Compl. ¶40.

Throughout Ms. Marsteller's employment, and at the time of her termination, Ms. Marsteller was the highest ranking female at ECS, and the only female executive (at the level of Vice President or above) at ECS.  Am. Compl. ¶39.

Ms. Marsteller was hired after being heavily recruited by Mr. Kapani.   At the time, Ms. Marsteller was interested in expanding her own business (Marstar) through subcontracting opportunities with ECS rather than becoming a full time employee of ECS.  In order to persuade Ms. Marsteller to lend her expertise to ECS, Mr. Kapani and Anthony Schulien, the CFO, offered to pay Ms. Marsteller the equivalent of one year of her Marstar salary if she secured new Federal Government services contracting business that would generate revenue equal or greater than the fully burdened rate for five Full Time Equivalents.  Am. Comp. ¶¶ 41-43.  While working in this capacity, Mr. Marsteller performed well and contributed to a number of contract wins involving the Department of Labor ("DOL") and the United States Department of Agriculture ("USDA") – both clients/customers Ms. Marsteller had been involved with at her previous place of employment, and as a in October of 2006 Ms. Marsteller was and offered her a full time position with ECS.  Am. Compl. ¶¶ 44-45.  Ms. Marsteller was offered a robust bonus plan and "ownership" in the company equal to 3% of the value of the company if ECS was sold.  Am. Compl. ¶46.

After Ms. Marsteller joined ECS, Scott Weaver ("Mr. Weaver") was hired to run the Business Development, and ECS' business model changed as Mr. Weaver took  responsible for all business development functions with limited support from executives in the Operations Departments such as Richard August ("Dr. August") and Ms. Marsteller.  Dr. August and Ms.

3

Marsteller, as the two most experienced Operations executives, were responsible for writing proposals. Am. Compl. ¶ 49.  During this time, Mr. Kapani often visited Dr. August and Mr. Weaver, Ms. Marsteller's male counterparts, when Jeffrey Powell (ECS' Executive Vice President, and Ms. Marsteller's direct supervisor at the time) as out of the office on travel but rarely did the same with Ms. Marsteller. Am. Compl. ¶ 50.

In March of 2009, Ms. Marsteller spoke to Mr. Powell regarding her concerns with the business pipeline, and the fact it did not have business that would support each of the business unit's revenue targets.  Mr. Powell explained that he and Mr. Kapani thought it was the "best pipeline ever," and further stated that it was not Ms. Marsteller's job to worry about it.  Am. Compl. ¶ 51.

In the fall of 2010, Ms. Marsteller learned that an offer had been made to purchase ECS. Since the amount was less than Mr. Kapani had expected, and the focus changed to increasing the value of the company, especially by winning "full and open" work.  Ms. Marsteller had been focused on two full and open opportunities, doing "pre-proposal preparation" for a large United States Postal Service National Customer Support Center (USPS NCSC) opportunity, and a full and open Government Wide Acquisition contract (GWAC) with HHS, CIO-SP3.  Historically, Mr. Kapani and ECS placed great value on GWAC vehicles, and this one is used more by DOD than any other agency.   Am. Compl. ¶ 55.

In December 2010, during bonus discussions, Mr. Kapani changed the terms of Ms. Marsteller's bonus plan, stating that he did not believe Ms. Marsteller should be compensated for revenues secured under existing ECS contracts that she had been responsible for winning, but which she no longer managed due to the formation of a new business unit.  Ms. Marsteller took exception to this, explaining that this was not appropriate given the bonus program that had been

4

offered to her, and which Ms. Marsteller accepted as part of her compensation.  In addition, Ms. Marsteller remained the "Officer in Charge" responsible for winning this work and had been the primary person responsible for writing these proposals. Am. Compl. ¶56.  Mr. Kapani agreed to continue to include the United States Department of Agriculture (USDA) Farm Services Agency (FSA) contract task orders in Ms. Marsteller's bonus program for 2010, but Ms. Marsteller was forced to forego the bonuses associated with the GNMA contract.  Although Ms. Marsteller had worked over Christmas holiday on the proposal to ensure a contract was in place to cover staff, Mr. Kapani took the position that he was the one responsible for the initial contract win years before, so therefore he refused to count it, unilaterally changing the terms of this portion of Ms. Marsteller's compensation.  Am. Compl. ¶57.

During this bonus discussion, Ms. Marsteller asked about the potential award of the USPS contact given the fact that Mr. Kapani evidently felt he could reorganize or change her bonus plan at any time.  Mr. Powell said that Mr. Kapani authorized him to assure Ms. Marsteller that if she secured the USPS NCSC business, ECS would pay Ms. Marsteller for the win in one lump sum at one percent (1%) of the total value of the contract ($155M). Am. Compl. ¶58.  Mr. Powell explained that ECS had entered into a similar agreement for Stanley Goodwin when ECS won the Army PEO STRI work. Am. Compl. ¶ 59.

In June 2011, Mr. Powell informed Ms. Marsteller and Dr. August of a new "capture management" role and explained that it would help ECS to achieve a new goal of for annual revenue in three years prior to selling the company.  Mr. Kapani said that as owners, they would all benefit from the resulting increased value and sales price of the company.  Although  Dr. August and Ms. Marsteller objected to the Capture Manager classification, which appeared to be a demotion (a junior business developer was the only other individual to hold this classification),

Mr. Kapani reassured them about their leadership and ownership roles in the company. Am. Compl. ¶¶ 60-62. During this same discussion, Mr. Powell informed Ms. Marsteller and Dr. August that the bonus plan would change as part of the reorganization. Am. Compl. ¶64.

On or around April 4, 2011, while Ms. Marsteller was still employed at ECS, ECS announced the successful capture of the USPS NCSC business, a contract valued at $155M. Ms. Marsteller was credited with the win based on her significant efforts resulting in the capture. Am. Compl. ¶ 65. Based on Mr. Kapani's representations that Ms. Marsteller would be awarded 1% of the USPS NCSC contract award, Ms. Marsteller was entitled to a bonus in the amount of $1.55M. Am. Compl. ¶ 66. Since bonuses were traditionally paid in late December (Christmas week) at ECS, Ms. Marsteller had no reason to believe she would not receive her bonus of $1.55M for the USPS NCSC contract in December 2011. Am. Compl. ¶ 67.

On October 21, 2011, Ms. Marsteller met with Mr. Wilson after a Friday morning meeting and asked what, if anything, she should be doing differently. Mr. Wilson told Ms. Marsteller she was doing everything right, and told her to just keep doing what she was doing, or words to that effect. By October 26, 2011, Ms. Marsteller was making progress on opportunities in her pipeline, establishing contacts, and moving forward. Am. Compl. ¶¶ 68-69. Around this same time, Ms. Marsteller received a letter from Mr. Kapani informing her that she had received a 1% salary increase. Am. Compl. ¶ 71.

On November 3, 2011, Ms. Marsteller attended a meeting conducted by Mr. Wilson. At that time, Mr. Wilson told Ms. Marsteller, "We don't see this working out with you," and stated that Ms. Marsteller was not "senior enough" to be a Senior VP in the Account Exec role (demonstrating Mr. Wilson's perception that Ms. Marsteller, as the only female member of the Senior Executive Team, was not as "senior" as her male colleagues. Am. Compl. ¶¶ 72-73. Mr.

Wilson also said Ms. Marsteller was not skilled in accounts or other areas the company was moving into, such as DOD agencies. He referred to Ms. Marsteller's expertise and business area focus as "low level, help desk, up for grabs every five years." He said the company wanted more Systems Engineering and Technical Assistance (SETA) work. In fact, Ms. Marsteller had been responsible for one of the largest contracts that ECS had at the time. Am. Compl. ¶ 74. Mr. Wilson told Ms. Marsteller that she would be "out" by the end of the year, but that Ms. Marsteller could announce her departure has having been her decision so that it would appear voluntary. Mr. Wilson claimed ECS "wanted this to be seen as a win/win" and was interested in hiring Ms. Marsteller as a consultant to ECS after her termination, effective Dec. 31, 2011. Am. Compl. ¶¶ 75-76.

When Ms. Marsteller asked about her expected and earned bonus on the USPS contract, Mr. Wilson told Ms. Marsteller that bonuses would be "much less than expected" since "this year we are not making our numbers." Ms. Marsteller questioned the truth of Mr. Wilson's statement, especially given the huge USPS win. Am. Compl. ¶ 77.

Ms. Marsteller was the only female Account Executive at ECS and the only female member of the Leadership Team (defined as having ownership and at a level VP or above). Am. Compl. ¶ 78.

Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to women owned and small businesses. In fact, Ms. Marsteller had not been focusing on 8(a) business. Of the $240 million in contract revenue and back log that Ms. Marsteller brought into ECS, less than 10% of that amount was 8(a) business. Am. Compl. ¶¶ 80-81. In fact, Ms. Marsteller's (male) Account Executive colleagues and Business Development peers (Scott Weaver) handled much

more 8(a) business (including recent wins at EPA).  They remained employed at ECS at the time of Ms. Marsteller's termination.  Am. Compl. ¶ 82.

Ms. Marsteller's male colleagues, who brought in less revenue, and all of whom had a less robust and qualified pipeline, were not terminated.  Meanwhile, ECS continued to pursue business in Ms. Marsteller's pipeline and other areas of expertise.  Am. Compl. ¶¶ 83-84. Significantly, in sharp contract to the stated (false) reason for her termination, ECS's website lists Ms. Marsteller's areas of practice as its top Service area under Solutions, IT Infrastructure Support, and Federal Civilian is still listed as one of ECS's three markets.  Am. Compl. ¶ 84.

Ms. Marsteller had much more experience than her male counterparts in the area of account management and business development, made significant contributions in 2011, and exceeded Division objectives.  Yet, she was terminated and her male colleagues were not.  Am. Compl. ¶ 85.

At the time of her termination, Ms. Marsteller was the only Account Executive or Business Development person who had meet their Annual Goals and Objectives.  Am. Compl. ¶ 86.

At the time of her termination (and as of today), ECS had not paid Ms. Marsteller her bonus on the amount of 1% of the value of the USPS NCSC contract, or $1.55M.  Am. Compl. ¶ 87.

Following the filing of Ms. Marsteller's lawsuit, ECS asserted certain counterclaims against her.

Ms. Marsteller then served the following discovery requests:

| Discovery Requests to ECS | Date/Manner of Service | Responses Due |
|---|---|---|
| 1st Interrogatories to ECS<br>1st Requests for Admissions to ECS | 7/3/13 by messenger | 8/2/2013 |

| 1st RFP to ECS | | |
|---|---|---|
| 2nd Interrogatories to ECS<br>2nd RFP to ECS | 7/31/13 by messenger | 8/30/2013 |
| 3rd RFP to ECS | 9/4/13 by messenger | 10/4/2013 |

## ARGUMENT

I.   **THE CONTRACT PIPELINE DETAILS THE HISTORY OF MS. MARSTELLER'S WINS AT ECS AND PROVE ECS CONTINUED TO PURSUE HER BUSINESS AFTER HER TERMINATION**

Contract Pipeline show all contracts and awards to Ms. Marsteller and her comparators during her employment.  The Contract Pipeline also underscores that, contrary to ECS' claim that it was moving in a different direction, ECS continued to pursue the business opportunities in Ms. Marsteller's line of business.

### A.   **The Pipeline Documents are Relevant to Plaintiff's Claims**

In the Amended Complaint, ¶¶ 74, 80, 83-84, Ms. Marsteller alleges:

At the time of Ms. Marsteller's termination, George Wilson, her then supervisor told her that she was not skilled in the areas that Company was alleging moving into and incorrectly referred to her work as "low level."

Mr. Wilson also said Ms. Marsteller was not skilled in accounts or other areas the company was moving into, such as DOD agencies.  He referred to Ms. Marsteller's expertise and business area focus as "low level, help desk, up for grabs every five years."  He said the company wanted more Systems Engineering and Technical Assistance (SETA) work.   In fact, Ms. Marsteller had been responsible for one of the largest contracts that ECS had at the time.

Mr. Wilson claimed the Company wanted to go in a different direction and incorrectly characterized what Ms. Marsteller did as the "8(a) stuff," which is a reference to women owned and small businesses.

Ms. Marsteller's male colleagues, who brought in less revenue, and all of whom had a less robust and qualified **pipeline**, were not terminated.

Meanwhile, ECS continued to pursue business in Ms. Marsteller's **pipeline** and other areas of expertise.  In fact, in sharp contract to the stated (false) reason for her termination, ECS's website lists Ms. Marsteller's areas of practice as its top

Service area under Solutions, IT Infrastructure Support, and Federal Civilian is
still listed as one of ECS's three markets.

(Emphasis added).

In addition, despite telling Ms. Marsteller that ECS was moving in a different direction, it
continued to pursue opportunities in her pipeline.  Mr. Kapani testified that an Account
Executive, Pete Santigan, was hired after Ms. Marsteller's termination, but stated that, in order to
determine whether Mr. Santigan pursued opportunities in Ms. Marsteller's pipeline, he would
need to compare her pipeline to Mr. Santigan's:

> Q   When did Santigan become hired?
>
> A   I don't know.  I'll have to check it.  But I
>     think it was relatively recent.  Maybe 2013.  Either
>     late 2012 or early 2013.
>
> Q   What projects does Mr. Santighan work on?
>
> A   I'd have to double-check those.  **I'm not
>     sure exactly what's in his pipeline.  I don't have the
>     list in front of me.**
>
> Q   Do you know whether Mr. Santighan is working
>     on any opportunities that Miss Marsteller worked on
>     while she was employed at ECS?
>
> A   I'm not sure.  **I'd have to compare Jackie's
>     list with his.**  Its possible, but I'm not positive.

Kapani Dep., **Att. 1** at 297:15-298-8 (Emphasis added).

ECS' "Contract Pipeline" shows was contracts/business ECS was awarded during a
particular year:

> Q   Does ECS keep any kind of summary of what new business it's obtained for
>     an annual year?  Is there a place where you can look and it says Summary
>     New Contracts?  Does ECS maintain any kind of document like that?
> A   Summary New Contracts?
> Q   Correct.  Or new work won I should say.

10

A   So we do have a list each year of what was awarded that year.  That doesn't necessarily mean that was the year it was bid.

Q   And is that document called something specific?  Is it Summary of --

A   **It's contract pipeline**. Of course a contract award also gets entered into the accounting system and the contracts system because you're now working on them.  So you can easily look at active contracts and say what was awarded this year just based on the award dates.  So the accounting system would have all that data.

Deposition of S. Roy Kapani, **Att. 1** at 318:2-20 (Emphasis added).

B.   **Plaintiff Requested (Several Times) and Has Not Received the Pipeline Documents**

Ms. Marsteller requested the Contract Pipeline documents Mr. Kapani testified regarding:

**Request No. 36**:  Please produce copes of all "Contract Pipeline" documents as discussed by Roy Kapani in his deposition, limited to the years 2008-present.

**OBJECTION**:  The request is overly broad and not reasonably calculated to lead to this discovery of admissible evidence. All "Contract Pipeline" documents, although inquired about during Mr. Kapani's deposition, are not relevant to the claims or defense in this matter.

ECS' Resp. to Pl.'s 2nd RFP, **Att. 2**.

In addition, Ms. Masteller requested ECS produce all documents identified in ECS' initial disclosures, and ECS did not object to doing so:

**Request No. 1**:  Please produced all documents you indentified in your Initial Disclsoures.
**Response:**  Responsive documents will be produced.

ECS' Resp. to Pl.'s 1st RFP, **Att. 3** at No. 1.

ECS identifies "Pipeline and Capture Plans" as relevant documents in its Initial Disclosures, **Att. 4** at p. 9, Section III "Computation of Damages."

Plaintiff further requested all documents relating to her pipeline:

**Request No. 15**: Please produce all documents that refer or relate in any manner to Ms. Marsteller's pipeline, pipeline reporting, or her business unit revenue targets.[1]

**Response**: See the documents produced in responsd to request No. 17.  See also ECS000250-51, 571-607.

ECS' Resp. to Pl.'s 1st RFP, **Att. 3** at No. 1.

ECS produced pieces of the pipeline, but did not object to this Request.  As such, ECS has no basis to withhold the Pipeline documents (or the Capture Plans).

## II.   PLAINTIFF HAS REQUESTED AND ECS HAS NOT OBJECTED TO THE PRODUCTION OF ALL OF THE DOCUMENTS ECS' REFENCES IN ITS INITIAL DISCLOSURES

Ms. Masteller requested ECS produce all documents indentified in ECS' initial disclosures, and ECS did not object to doing so:

**Request No. 1**: Please produced all documents you indentified in your Initial Disclsoures.
**Response:**  Responsive documents will be produced.

ECS' Resp. to Pl.'s 1st RFP, **Att. 3** at No. 1.

In ECS' Initial Disclosures, **Att. 4** at p. 9-10, Section III "Computation of Damages," ECS identifies the following documents:

- Pipeline and Capture Plans;

- Job Summary Reports ("JSRs") & USPS NCSC Rates/Invoices; and

- Waterfall documents.

While each of these documents relates to Ms. Marsteller's claimed damages they are the genesis for ECS' alleged damages.  As such, ECS cannot withhold the production of these materials.

---

[1] Per the instructions to Ms. Marsteller's Requests, the time limit is from January 1, 2006 to the present unless otherwise indicated.

Throughout ECS' Initial Disclosures, it also references documents that it maintains were misappropriated.

Plaintiff has requested:

**Request No. 37**:  Please produce all documents ECS maintains Ms. Marsteller misappropriated, misused, or disclosed as alleged in its counterclaims.
**Objection:**  The request is overly broad and unduly burdensome.  Ms. Marsteller seeks the production of hundreds of documens that are already in her possession.  Such documents have already been identified on the files lists produced by Sensei.  Moreover, through the request Ms. Marsteller seeks the return of documents that she misappropriated in an effort to justity their misappropriation.

**Request No. 38**:  Please produce all documents ECS maintains Ms. Marsteller converted as alleged in its counterclaims.
**Objection:**  The request is overly broad and unduly burdensome.  Ms. Marsteller seeks the production of hundreds of documens that are already in her possession.  Such documents have already been identified on the files lists produced by Sensei.  Moreover, through the request Ms. Marsteller seeks the return of documents that she misappropriated in an effort to justity their misappropriation.

ECS' Resp. to Pl.'s 3rd RFP, Att. 5 at 37-38.

This request is not overly broad as it relates directly to ECS' claimed misappropriation, and each of the alleged misappropriated documents is relevant.  In addition, on October 3, 2012, Ms. Marsteller's computer forensic expert, Julian Ackert submitted a report indicating that only 189 of the documetns on Ms. Marsteller's hard drive were opened or accessed after her termination date,  Attachment 6 at pp. 1-2.  Ms. Marsteller is entitled to know the relevant universe of documents on which ECS' premises its claims.

At this point, Ms. Marsteller has returned her drives and computer to Sensei to delete ECS files and is entitled to a copy of any documents ECS' intends to use at trial to defend its claim, so ECS' objection that materials are in Ms. Marsteller's possession, for many of the documents is no may no longer be accurate.

ECS has further put the documents at issue by premising counterclaims on them and cannot now decline to provide to Ms. Marsteller the items it intneds to present at trial.   In defending ECS' counter-claims, each document on which ECS bases its claims must be reviewed by the trier of fact.

In *Glynn v. EDO Corporation*, 2010 U.S. Dist. LEXIS 86013, at *12 (D. Md. 2010), the Honorable J. Frederick Motz considered whether the plaintiff improperly retaining proprietary and confidential materials after his termination.  In *Glynn*, the court noted that the resolution of that issue, which was the basis of the defendant's counterclaims, was one that may require a "document by document" analysis:

> The former sub-charge – which may require an analysis of the substance and validity of the Employment Agreement and a document by document analysis of which information retained by [plaintiff] is proprietary or confidential--- is inappropriate for resolution at this stage of litigation.  Rather, these issues are intertwined with the merits of [defendant's] substantive counterclaims, and are therefore best left to be addressed, if necessary, after merits of the counterclaims have been resolved.

*Id.* at *12-13.

As such, Ms. Marsteller is entitled to know what documents remain at issue and to have producued to her those materials that form the basis of the Defendant's claim.

III.   **PLAINTIFF AND THIRD PARTY WITNESSES HAVE PRODUCED RESPONSIVE EMAILS NOT PROVIDED BY ECS**

ECS has produced few emails in this litigation, has not produced certain relevant emails provided by Ms. Marsteller, and other relevant emails were provided in response to Ms. Marsteller's subpoena to a strategic consultant on the USPS proposal.

Plaintiff requested all documents (which would include electronic documents) relating to business in her pipeline at the time of her termination and any business ECS continued to pursue. ECS did not object to this Request and cannot object at this point:

**Request No. 45:**  Please produce all documents that refer or relate to any business that was in Ms. Marsteller's pipeline at the time of her termination that ECS continued to pursue in any manner, whether or not a contract, task order, or any other business resulted.  For any that resulted in a contract, task order or business, please produce all documents to determine the value of the business and the revenue generated by ECS to date from that contract, task order or business.

**Response:**  Responsive document (sic), if any, will be produced.

**Request No. 15:**  Please produce all documents that refer or relate in any manner to Ms. Marsteller's pipeline, pipeline reporting, or her business unit revenue targets.

**Response:**  See the documents produced in response to request No. 17.  See also ECS000250-251, 571-607.

ECS' Resp. to Pl.'s 1st RFP, Att.3 at 45 and 15.

For example, ECS' internal email from the month of Ms. Marsteller's termination

(December 2011) relate to the business Ms. Marsteller was engaged after her November 3, 2011

notice of termination and that certain files were sent to her – *by ECS*:

- Email of December 1, 2011 forwarding Ms. Marsteller "Slides for the Strategic Operations Meeting 12-2" – requesting Ms. Marsteller (and all recipients), "Please look through and email me if there are any changes or corrections before the meeting tomorrow. . . ." **Att. 7.**

- Email of December 6, 2011 from CFO Anthony Schulien copying Ms. Marsteller with an "FYI" and note regarding extending ECS' CIO-SP3 pricing.  **Att. 8.**

- Email of December 7, 2011 from President George Wilson to Ms. Marsteller telling her he would provide her a consulting agreement – that would extend her work with the company.  **Att. 9.**

- Email of December 17, 2011 from Jeff Powell to Jackie Marsteller providing her "FYI" on "Modification to GSA (Contract)."  **Att. 10.**

Similarly, in response to a subpoena to consultants, Postal Logistics Solutions – J4 ("J4"),

who provided strategic support to Ms. Marsteller and her team at ECS, J4 further provided

relevant emails not provided by ECS.

Information regarding Ms. Marsteller's work on the USPS proposal and contract is relevant because Roy Kapani testified that Jackie Marsteller was not critical to the USPS proposal:

> Q   The only reason you think Miss Marsteller would have been listed as a key person for the USPS deal was because she wrote the proposal?
>
> A   Right.  Jackie was not critical to the USPS proposal.

Kapani Dep., Att.1 at 149:20-150:2.

However, Tess Swatt, an ECS Vice President and formerly USPS Program Manager testified that Ms. Marsteller was responsible aspects of ECS' strategy on the USPS Contract including the inclusion of a consultant group of former USPS executives, J4, who assisted with the capture strategy for the proposal:

> Q   Okay.  Do you recall what items Ms. Marsteller was handling as part of pursuing the capture of the United States Postal Service work?
>
> A   I know she had -- she had conversations with potential teaming partners such as HP, and I think we -- she already had the relationship with Tech Systems, which was part of our -- which was part of the strategy.  I think the Harris conversation just evolved from both our sides because we were both talking to people from -- the folks from Harris.  She was talking with -- she periodically would talk to Dan Garrison. I periodically would talk to a guy named Monty Montgomery.  I think Jackie also talked with David Trask who eventually got involved.

Tess Swatt Dep., Att. 11_ at 31:11-32:3; *see also* 27:5-28:2 (Swatt was prior USPS Project Manager).

> Q   Now, do you know -- do you recall J4 being involved in the capture strategy?
>
> A   I do, yes.
>
> Q   Do you know whether it was Ms. Marsteller who brought in J4?
>
> A   Well, J4 came in -- came to us.  We won a contract at the USPS OIG, and after we won that contract, it was -- there was some sort of announcement that was posted someplace, and J4 actually reached out to us and said, hey, we're a bunch of retired postal guys, we've got this consulting firm if you ever need us.  So I believe it was Jackie who said, hey, let's reach out to these guys and see what they can bring to the

table.  Now, I don't remember if she reached out to them or I reached out to them, but we reached out to them to see what they could do to help us, and I remember that we did meet with them.

Swatt Dep., Att. 11 at 32:2-33:19.

Q   Do you know what content J4 might have provided with respect to the capture plan or the strategy that was put together?

A   Well, what J4 had -- J4 had on their team this person, Wayne Orbke, who used to be sort of the deputy facility manager at the NCSC.  And so Wayne was able to provide us with what the organization looked like.  I think he provided us with an organizational chart.  He provided us with sort of a breakdown of the functions within that organization.  He was able to provide us generally with the number of staff of both the postal staff and the contract staff.  So more than anything, he kind of helped us with our organizational -- figuring out how our organizational structure should look like.  And then the other thing that J4 was very involved with was reviewing our document, participating in our red team review.

Q   And when you say the document, would that be the proposal?

A   The proposal, correct, yes.

Swatt Dep., Att. 11 at 34:13-35:11.

In addition to the above Requests for Production, Plaintiff requested all documents that relate to her work on the USPS NCSC contract and correspondence relating to the USPS contract:

**1st Request, No. 41:**  Please produce all documents that refer or relate to Ms. Marsteller's work on any aspect of the USPS NCSC contract.

**Objection:**  The request is overly broad and not reasonably calculated to lead to the discovery of admissible evidence, as Plaintiff's claims do not relate to "work on any aspect" of the contract.

**3rd Request, No. 21:**  Please produce copies of all correspondence relating in any manner to the USPS NCSC contract and/or the teaming agreement and subcontract with Harris.

**Objection:**  The request is overly broad in that it fails to "describe with reasonable particularity each item or category of items to be inspected," as required by Rule 34(b)(1)(A), "relating in any manner to the USPS NCSC contract and/or teaming agreement and subcontract with Harris," is overly broad and not reasonably calculated to lead to the discovery of admissible evidence.

17

ECS' Resp. to Pl.'s 1st RFP, Att.3 at 41 and 21.

These requests are not overly broad as they related directly to rebutting any claim that Ms. Marsteller was not critical to the USPS contract or in other words, not responsible for the win.

Plaintiff subpoenaed J4 documents that resulted in the production of 262 pages, many of which were emails between Jackie Marsteller and Tess Swatt, and others that show Ms. Marsteller's involvement in the strategy of the USPS win, including:

- Email from Jackie Marsteller to Don Spatola, of J4, dated October 8, 2010, containing request for information from J4 so she can include them in her section of the proposal. Att. 12.

- Email from Jackie Marsteller to Don Spatola, of J4, dated October 23, 2010, commenting on the draft executive summary to the proposal sent to her for consideration.  Att. 13.

These emails were not produced by ECS.

The above emails were to and from Jackie Marsteller, and would likely be available on her ECS work computer, her personal computer (which has been the subject of litigation, was imaged by ECS' computer forensic expert), and also available on ECS internal server.  Yet, these and other relevant emails have not been produced by ECS.

## IV.    JACKIE MARSTELLER, JEFF POWELL, AND ROY KAPANI'S EMAILS THE DAY PRIOR TO AND OF MR. POWELL'S 1% PROMISE TO PLAINTIFF ARE REASONABLY CALCULATED OT LEAD TO ADMISSIBLE EVIDENCE

Ms. Marsteller has alleged that Mr. Powell promised her a 1% commission after speaking with Mr. Kapani at the time of her bonus review:

> During the bonus discussion, Ms. Marsteller asked Mr. Powell how she should feel about the potential award of the USPS contact; the fact that he and Mr. Kapani could reorganize at any time; and, the fact that Mr. Kapani did not feel the need to reward Officers in Charge/Division Leads for work they were responsible for winning if they no longer managed the work.  Mr. Powell relayed that Mr. Kapani authorized him to assure Ms. Marsteller that if she secured the USPS NCSC business, ECS would pay Ms. Marsteller

18

for the win in one lump sum at one percent (1%) of the total value of the contract ($155M).  Mr. Powell later referred to the promised bonus as the "one percent lump sum."

(Pl.'s Am. Complaint ¶58).

Ms. Marsteller has sought all emails between Mr. Kapani and Mr. Powell the day of and the day prior to the bonus discussions to determine their activities on that day and regarding conduct that would underscore that the two executives were engaged in discussions relating to the promise to Ms. Marsteller, and also her communications those days may evidence the discussion.

Plaintiff requested:

**3rd RFP, No. 13:**  Please produce copies of all emails between Roy Kapani and Jeff Powell on 12/10/10 and 12/11/10.

**Objection:**  The request is overly broad in that it fails to "describe with reasonable particularity each item or category of items to be inspected," as required by Rule 34(b)(1)(A) as it seeks "all emails between Roy Kapani and Jeff Powell" without regard to subject matter.

**3rd RFP, No. 14:**  Please Produce copies of all emails to and from Jackie Marsteller on 12/10/10 and 12/11/10.

**Objection:**  The request is overly broad in that it fails to "describe with reasonable particularity each item or category of items to be inspected," as required by Rule 34(b)(1)(A) as it seeks "all emails to and from Jackie Marsteller" without regard to subject matter.

Defendants object that the requests are overly broad and not sufficiently described.  To the contrary, the request are extremely limited in time – a 48 hour period – and thus can be obtained by searching those date parameters.  The conduct of these three individuals during this 48 hour period is highly relevant to Ms. Marsteller's commissions' claims and reasonably calculated to lead to the discovery of admissible evidence.

## V.  PERSONNEL FILES OF PLAINTIFF'S MALE COMPARATORS WHO HAD NOT MET THEIR GOALS BUT WERE NOT TERMINATED

Ms. Marsteller has alleged that she was terminated after securing ECS' second largest contract win in the Company's history, while her male comparators, who had not met their performance goals, were permitted to retain their positions, Am. Complaint ¶¶ 85-86:

> 85. Ms. Marsteller had much more experience than her male counterparts in the area of account management and business development, made significant contributions in 2011, and exceeded Division objectives.  Yet, she was terminated and her male colleagues were not.

> 86. At the time of her termination, Ms. Marsteller was the only Account Executive or Business Development person who had meet their Annual Goals and Objectives.

Of further significance, on October 25, 2011, just two weeks prior to Ms. Marsteller's November 3, 2011 notice of termination, Ms. Marsteller received a raise.  ECS notified Ms. Marsteller that:

> Electronic Consulting Services, Inc. ("ECS") is pleased to notify you of your salary increase as a result of your 2011 annual performance review.
> . . .
> Thank you for your efforts and continued support.  We look forward to continuing a productive and mutually rewarding relationship.

Att. 14.

As such, whether Ms. Marsteller's male colleagues were similarly rewarded is  relevant in assessing her performance against theirs.

Ms. Marsteller requested:

**3rd RFP, No. 5:**  Please produce the personnel files for the following individuals:

- Scott Weaver
- Mike Sinisi
- Alan Goldstayn
- Richard August
- Stu Williams
- Neel Gopalani

- Randy Ball
- Geoff Raines
- Pete Santegan
- Any Account Executive hired by ECS after Ms. Marsteller's termination.

**Objection:** The request is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Moreover, the entire personal (sic) files contain personal family and financial information that is not relevant to the claims or defenses in this matter.

ECS' Resp. to Pl.'s 3rd RFP, Att.5 at No. 5.

The personnel files of Ms. Marsteller's comparators are reasonably calculated to lead to admissible evidence regarding the job duties of those individuals, the evaluation system for the those individuals, their performance, their supervisors, the projects they were involved in, their compensation system (which was likely based on their ability to capture/win business), their official title and positions, whether they have been promoted, and, whether their goals for 2012 and 2013 involved pursuing business opportunities in Ms. Marsteller's former areas.

To the extent the files contain sensitive personal information, those documents may be produced subject to the Parties' Stipulated Protective Order.

While Mr. August file has been produced it is unclear whether the file was complete. While ECS indicated it would continue to check, it has not so further indicated.

Similarly, Ms. Marsteller alleged that ECS told her she would be terminated because it believed her business was largely 8(a) business:

**Request No. 28:** Please produce documents sufficient to determine the percentage of revenue attributed to each Account Executive that is attributable to 8(a) business.

**Response:** Responsive documents, if any, will be produced.

ECS' Resp. to Pl.'s 1st RFP, Att. 3 at No. 28.

Ms. Marsteller further requests personnel and other files that would indicate what percentage of 8(a) business to which other (male) Account Executives were devoted.

21

While Mr. Powell further denied that he signed any agreements to cooperate regarding his testimony as part of his payments, other related provisions in the Separation Agreement may also be relevant.

Plaintiff requested:

**3rd RFP, No. 10:**  Please produce copies of any separation agreement, or other similar agreement, presented to and/or signed by Jeff Powell, from 2010 to present.

**Objection:**  The request is not reasonably calculated to lead to the discovery of admissible evidence.  Ms. Marsteller is not claiming that she should have received a separation agreement or any discrimination with regard to the separation agreement that was offered to her.

Att. 5 at No. 10.

The request is reasonably calculated to lead to the discovery of admissible evidence, and, in fact is likely to be directly admitted in any trial of the issues.

## VII.   OTHER COMPLAINTS OF DISCRIMINATION

In *Sprint v. Mendelsohn*, 552 U.S. 379 (2008), the U.S. Supreme Court settled a split among the Circuits, in considering, "whether, in an employment discrimination action, the Federal Rules of Evidence require admission of testimony by nonparties alleging discrimination at the hands of persons who played no role in the adverse employment decision challenged by the plaintiff." *Id.* at 383.  In *Sprint*, the District Court excluded the testimony of five individuals who would have supported the plaintiff's claim that Sprint engages in a pattern or practice of discriminating against older workers, by requiring approval to hire anyone over the age of 40, considering age in layoff decisions, rejecting the employment applications of older workers, etc. *Id.* at 381-82.   In a minute order, the District Court excluded evidence related to certain non-plaintiff employees. *Id.* at 382.

23

On appeal, the U.S. Supreme Court held that the evidence was not *per se* inadmissible, and must be considered based on several factors including how closely related the evidence is to the plaintiff's circumstances and the theory of the case. *Id.* at 387.   The U.S. Supreme Court's determination that the complaints of non-plaintiffs who reported to *other* supervisors may be admissible, makes clear that those complaints of other plaintiffs who reported to the exact same supervisors during the same general time frame, and who suffered the same treatment would then be admissible.

Moreover, in the recent case of *Burgess v. Bowen*, 2012 U.S. Dist. LEXIS 142631, *25 (E.D. Va. October 2, 2012)(Cacheris, J.), the Court held that evidence regarding a supervisor's "opinion of and actions towards persons who make or made complaints" was admissible.  In *Burgess*, the Court refused to exclude testimony that a supervisor said, "These people who file discrimination complaints are weak links," and that other supervisors should "bad mouth some people, plaintiffs. . . . who were suing the [Employer] over job discrimination . . . ." *Id.* at 25-26. Judge Cacheris found that evidence was probative evidence of retaliatory animus. *See Id.* at 27. [2]

*Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010), which is not controlling on this Court, sets out factors courts may consider when ruling on "me too" evidence: (1) temporal proximity to the events in question; (2)whether the same decision maker was involved; (3) whether plaintiff and others were treated in the same manner; (4) whether plaintiff's were similarly situated.

> **Request No. 30**:  Please produce copies of all documents reflecting each
> complaint any employee has made against any employee of ECS in the position
> of manager or above (including supervisors and officers) or against ECS itself,
> with respect to gender discrimination, whether written or oral, internally to any
> ECS managerial or supervisory employee, or with any outside administrative
> agency, from 2001 to the present.  With respect to each complaint, please

---

[2]

provide all documents relating to each investigation and action taken by ECS, and the final result of each such complaint and how it impacted the employees making the complaint or the employees who were the subject of the complaint.

**OBJECTION:** The request is overly broad and not reasonably calculated to lead to the discovery of admissible evidence as there are no allegations of disparate treatment or a pattern and practice of discrimination, further the request is not limited to complaints against the specific individuals alleged to have engaged in discriminating in this matter.

ECS' Resp. to Pl.'s 1st RFP, Att. 3 at 30.

The documents are reasonably calculated to lead to admissible evidence, if they exist.

## CONCLUSION

For the reasons stated above, ECS' objections should be overruled, and ECS should be compelled to respond fully and completely to Plaintiff's Third Request for Production of Documents.

October 4, 2013

Respectfully submitted,

*/S/ CARLA D. BROWN*

Carla D. Brown, VSB No. 44803
cbrown@cbcblaw.com
Brian A. Scotti, VSB No. 74510
bscotti@cbcblaw.com
CHARLSON BREDEHOFT COHEN
 BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Jacqueline D. Marsteller*

**CERTIFICATE OF SERVICE**

I hereby certify on the 4th day of October 2013 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Michael E. Barnsback, Esq.
> Sarah C. Reimers, Esq.
> LeClair Ryan
> 2318 Mill Road, Suite 1100
> Alexandria, VA 22314
> (703) 647-5931 Telephone
> (703) 647-5993 Facsimile
> Michael.barnsback@leclairryan.com
> Sarah.reimers@leclairryan.com
> *Counsel for Defendants ECS Federal, Inc.,*
> *S. Roy Kapani and George Wilson*
>
>
> */S/ CARLA D. BROWN*
> _____
> Carla D. Brown, VSB No. 44803
> cbrown@cbcblaw.com
> Brian A. Scotti, VSB No. 74510
> bscotti@cbcblaw.com
> CHARLSON BREDEHOFT COHEN
>  BROWN & SAKATA, P.C.
> 11260 Roger Bacon Drive, Suite 201
> Reston, Virginia 20190
> (703) 318-6800 Telephone
> (703) 318-6808 Facsimile
> *Counsel for Plaintiff, Jacqueline D. Marsteller*